UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

CHRISTOPHER McCLUNEY, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

Plaintiffs,

v.

TREACE MEDICAL CONCEPTS, INC., JOHN T. TREACE, and MARK L. HAIR,

Defendants.

Case No: 3:25-cv-00390-JEP-PDB

THIRD AMENDED
CLASS ACTION COMPLAINT

DEMAND FOR A JURY TRIAL

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ..................................................................... 2

JURISDICTION AND VENUE.................................................................. 17

PARTIES ..................................................................................................... 17

A. Lead Plaintiff ..................................................................................... 17

B. Defendants ......................................................................................... 18

SUBSTANTIVE ALLEGATIONS .............................................................. 19

A. Background ......................................................................................... 19

B. Between 2020 and 2022, Lapiplasty Enjoys Initial Commercial Success, and TMCI's Stock Price Soars ...................................... 22

C. Before and During the Class Period, TMCI Portrays Itself and Lapiplasty as "Differentiated" Market Leaders ........................... 25

D. Beginning in 2023, The Impact of Stryker's Service Line Contracts Began to Fundamentally Undermine TMCI's Competitive Position And "Runway" of Future Sales.................. 38

E. To Maintain the Narrative of "Seasonality" – And Thus the Illusion of Growth – Defendants Pressure the Company's Sales Force to Sell as Many Lapiplasty Kits as Possible in the Fourth Quarter of 2023 and First Quarter of 2024 ................................. 54

F. Having Aggressively Sold APOs in the Fourth Quarter of 2023, Defendants Report Positive Results and Triple Down on Dismissing Competitive Threats ................................................ 58

G. The Truth Emerges as Treace Admits "Competitive Pressure" Was "Creating a Headwind" for TMCI ........................................ 65

MATERIALLY FALSE AND MISLEADING STATEMENTS ........................ 69

A. False and Misleading Statements Regarding Lapiplasty, TMCI's Business Model, and the Competitive Dynamics of the Market for Bunion Correction .... 70

B. False and Misleading Seasonality Statements .... 82

C. False and Misleading Statements Regarding the Quality and Sustainability of the Company's Revenues in the Fourth Quarter of 2023 .... 88

D. False and Misleading Internal Disclosure Control Statements.. 92

THE TRUTH EMERGES: LOSS CAUSATION .... 98

ADDITIONAL ALLEGATIONS OF SCIENTER .... 106

CLASS ACTION ALLEGATIONS .... 118

APPLICABILITY OF PRESUMPTION OF RELIANCE .... 120

FIRST CLAIM .... 123

SECOND CLAIM .... 129

THIRD CLAIM .... 132

PRAYER FOR RELIEF .... 136

JURY TRIAL DEMANDED .... 137

Lead Plaintiff Special Situations Private Equity Fund, L.P ("Lead Plaintiff") brings this action individually and on behalf of a class of those who purchased or otherwise acquired Treace Medical Concepts, Inc. ("Treace Medical," "TMCI," or the "Company") common stock between May 8, 2023 and May 7, 2024, inclusive (the "Class Period"). Lead Plaintiff pursues claims against Defendants Treace Medical, John T. Treace ("Treace") and Mark L. Hair ("Hair") (Treace and Hair, together, the "Individual Defendants," and together with TMCI, "Defendants"). The allegations herein are based on Lead Plaintiff's personal knowledge as to its own acts and on information and belief as to all other matters, such information and belief having been informed by, among other things, an investigation by counsel, which included review of: (1) documents publicly filed with the Securities and Exchange Commission ("SEC"); (2) analyst reports about TMCI; (3) Defendants' public statements; (4) other publicly available information concerning TMCI; (5) a review of documents publicly filed in *Treace Medical Concepts, Inc. v. Stryker Corporation et al.*, 2:24-cv-09763 (D.N.J.) and *Treace Medical Concepts, Inc. v. Zimmer Biomet Holdings, Inc. et al.*, 1:25-cv-00592 (D. Del.); and (6) interviews with former Treace Medical employees. Lead Counsel's investigation into the factual allegations contained in this Third Amended Complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial

additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for further investigation or discovery.[1]

## NATURE OF THE ACTION

1. This is a federal securities fraud class action brought on behalf of all purchasers of Treace Medical common stock between May 8, 2023 and May 7, 2024, seeking to pursue remedies under the Securities Exchange Act of 1934 ("Exchange Act"). Lead Plaintiff and the Class seek to recover investment losses suffered as a result of materially false and misleading statements and omissions made by Defendants about the superiority of TMCI's flagship product, the Company's ability to sustain market share growth against competitors, the quality and sustainability of the Company's revenues in the fourth quarter of 2023, and the effectiveness of the Company's internal disclosure controls and procedures.

2. Treace Medical is a medical device company. During the Class Period, the Company served effectively one market: the bunion correction market. Its primary, and effectively sole, product was the Lapiplasty 3D Bunion Correction System ("Lapiplasty"), which the Company describes as "a combination of innovative instruments, implants and surgical methods

[1] Unless otherwise indicated, all emphasis in this Third Amended Complaint has been added.

designed to improve the inconsistent clinical outcomes of traditional approaches to bunion surgery."

3. When first introduced, Lapiplasty appeared to present a significant improvement to the two traditionally dominant bunion correction procedures: (1) the metatarsal osteotomy, and (2) the Lapidus Fusion technique (collectively the "Legacy Procedures"). Before and during the Class Period, TMCI's Chief Executive Officer ("CEO") John T. Treace repeatedly emphasized that Lapiplasty was a "disruptive" technology "backed by strong intellectual property, compelling clinical datasets, and . . . the industry's only bunion-focused direct sales channel." As Treace stated as late as February 2024: "Here at Treace [Medical], we're driving a fundamental shift in the surgical treatment of bunions through our proprietary Lapiplasty Procedure, which is well on its way to becoming a standard of care. . . . [W]ith nearly one in four adults in the US affected by bunions, we believe this represents the most compelling opportunity in the foot and ankle reconstructive market today."

4. TMCI completed its initial public offering ("IPO") in 2021. However, because TMCI was not profitable at this time (or at any time during the Class Period), investors were intensely focused on the Company's ability to demonstrate consistent and sustainable revenue growth. Unlike larger medical device companies with broad portfolios of unrelated products, TMCI's

narrow focus on bunion correction meant that its ability to demonstrate revenue growth was entirely dependent on the commercial success of Lapiplasty. Moreover, given the nature of the market for bunion correction surgery – where a surgeon's use of any product other than Lapiplasty represents a lost sale for TMCI for all time – the commercial success of Lapiplasty was, in turn, dependent on the existence and nature and extent of potential competitors and substantially similar products ("SSPs") to Lapiplasty

5. To outside observers and the market, TMCI was growing between 2020 and 2023, as surgeons were increasingly adopting Lapiplasty and using it in lieu of the Legacy Procedures, which allowed Lapiplasty to grow at a compound annual rate of nearly 50% per year from 2020 to 2023. Indeed, TMCI appeared to be seizing market share from Legacy Procedures.

6. Given these dynamics, securities analysts were keen to learn more about, and often directly inquired about, the Company's revenue growth and the competitive environment, which were major conversation topics at nearly all earnings calls and other presentations that the Individual Defendants gave to the investment community during the Class Period. Investors knew that if Lapiplasty was to continue to show 50 percent year on year growth, TMCI would need to be successful in competing against other products in the market, which included both Legacy Procedures and SSPs.

7. Before and during the Class Period, Defendants allayed these investor concerns with two points of emphasis.

8. ***First***, TMCI and Treace repeatedly trumpeted the supposedly superior medical quality of Lapiplasty to all other bunion correction products. In short, TMCI and Treace led the market to believe that there were effectively three classes of such products: (1) outdated Legacy Procedures, (2) products that were "like" – but far inferior to – Lapiplasty (i.e., SSPs), and (3) Lapiplasty. Of course, in Treace's telling, the Company and its signature product were in a class of their own: Lapiplasty was "unmatched"; TMCI and its products were "differentiated"; there was "no substitute"; and TMCI was "way out ahead" of the competition – in fact, "so far ahead" that, even if a potential competitor was developing an SSP, by the time that competitor's product reached the market, TMCI would already be "two or three generations ahead." TMCI and Treace repeatedly downplayed the relevance and impact of the competition, implying to the market that Lapiplasty was not only better than the Legacy Procedures and potential SSPs, but ***uniquely*** better. Treace further implied that the strength of TMCI's portfolio of intellectual property ("IP") insulated the Company from potential competition. Treace went as far as to state on numerous occasions that the largest obstacle to widespread acceptance of Lapiplasty was surgeon ignorance about the efficacy of Lapiplasty; in Treace's words, TMCI's "biggest competitor" was not a fellow

medical device manufacturer but instead the "instilled dogma" in the "surgeon mindset" regarding the superiority of Legacy Procedures.

9. ***Second***, TMCI and Treace repeatedly portrayed TMCI's sole focus on bunion correction as a competitive advantage over larger, more diversified medical device companies that marketed products across a broad range of product lines; that is, they emphasized that unlike larger competitors that offered such a broad range of products (of which bunion correction products represented a miniscule percentage), TMCI's narrow focus on the bunion correction market meant that the Company was better equipped to compete in that market vis-à-vis larger competitors because (1) its R&D department would be able to innovate more quickly, and (2) its sales force would be able to market its products more effectively. Specifically, according to Treace, because TMCI was "a company with over 400 people that only do this [i.e., focus on bunion correction] all day long . . . . [I]t's hard not to be shooting behind if you're a competitor." In other words, TMCI was uniquely positioned to dominate the bunion correction market because bunion correction was the Company's only focus, and larger competitors with more diversified product lines would therefore always be playing catchup. As Treace framed it, for a "big diversified player," "it's hard to compete with a highly focused company that's so far ahead and moving that fast."

10. In sum, TMCI and Treace led the market to believe that because Lapiplasty was ***so*** superior to the competition, and because TMCI was ***solely*** focused on bunion correction, the Company's business fundamentals were strong and its impressive growth profile was sustainable.

11. But the reality was the exact opposite, and in 2023, TMCI started to experience slowing growth. Even if Lapiplasty was an improvement to the Legacy Procedures, TMCI's competitors had developed products that were effectively identical to Lapiplasty, and these SSPs were actively taking market share from Lapiplasty during the Class Period. Even if Lapiplasty was marginally more effective than the SSPs of TMCI's competitors, the SSPs were close enough to Lapiplasty that TMCI itself viewed them as "copycats," "me too" products, and "knockoffs." TMCI was not "out ahead" of these alternative products, which surgeons were increasingly opting to use in lieu of Lapiplasty; at best they were tied.

12. Because Lapiplasty did not stand alone in this product class, the Company's ability to compete with SSPs, and thus to continue demonstrating sustainable growth, effectively came down to one factor: the relative cost of the competing products. But Lapiplasty was more expensive, as TMCI admits.

13. As to the sole focus of TMCI, and contrary to what TMCI and Treace implied to the market, the reality was that it did not represent an unmitigated competitive advantage but instead camouflaged a severe risk:

***because*** TMCI was not in a class of its own, the fact that TMCI was solely focused on one market actually ***contributed*** to the Company's inability to sustain market share growth.

14. Post-Class Period developments provide extensive detail of this competitive dynamic. In fact, the details surrounding the reasons for TMCI's slowing growth were supplied by TMCI itself in a pair of lawsuits against competitors, i.e., manufacturers of SSPs.

15. On October 14, 2024, TMCI filed a complaint against a competitor, Stryker Corporation ("Stryker"), and its subsidiary Wright Medical Technology, Inc., for patent infringement and violations of the antitrust laws, among other things (the "Stryker Complaint"). Similarly, on May 12, 2025, TMCI sued Zimmer Biomet Holdings, another competitor, and its subsidiary Paragon 28, Inc. (the "Zimmer Complaint").[2]

16. In both the Stryker Complaint and the Zimmer Complaint, TMCI makes extensive admissions about how Stryker and Zimmer were successfully competing against TMCI and taking market share from Lapiplasty during the Class Period.

17. First, in both Complaints, TMCI admits that the bunion correction products developed by Stryker and Zimmer are, in fact, substantially similar

[2] Copies of the publicly available Stryker Complaint and Zimmer Complaint are attached hereto as **Exhibits A and B**, respectively.

to Lapiplasty; indeed, identical in many respects – so much so that TMCI viewed them as "copycats."[3] The fact that both Stryker and Zimmer were able to develop and market what TMCI now refers to as "copycats" undermines numerous of Treace's Class Period statements about the strength of the Company's IP and the "unmatched" quality of Lapiplasty.

18. Second – and more importantly – TMCI's allegations in the Stryker Complaint shed light on a far more fundamental competitive dynamic that Defendants concealed from investors during the Class Period.

19. Stryker is a large medical device company that markets products across a broad range of product lines; i.e., Stryker is the type of "big diversified player" that Treace repeatedly dismissed as a serious threat to Lapiplasty's growth profile.

20. The foundational allegation of the Stryker Complaint is that Stryker was able to seize market share from Lapiplasty by "bundling" Stryker's own, substantially similar bunion correction product – Stryker's ORTHOLOC 2 LapiFuse Triplanar Bunion Correction System ("LapiFuse") – in its service line contracts with Integrated Delivery Networks ("IDNs"). As set forth in greater detail below, service line contracts allow a medical device manufacturer, such as Stryker, to require the IDN to purchase a substantial

[3] Stryker Complaint ¶ 63; Zimmer Complaint ¶ 50.

majority of its medical devices and equipment from that manufacturer, in exchange for a considerable rebate. Accordingly, as more and more of Stryker's pre-existing service line contracts came up for renewal between 2020 and 2023, Stryker began to include LapiFuse in such contracts. Given the cheaper price tag associated with LapiFuse and the contractual incentive to purchase LapiFuse, an IDN would only choose to purchase the "out-of-contract" Lapiplasty instead of the "in-contract" LapiFuse if Lapiplasty truly was of significantly higher quality than LapiFuse to justify the additional costs. However, because LapiFuse (a "copycat") *was* of substantially similar quality to Lapiplasty (which was not "unmatched in performance"), LapiFuse began to take market share from Lapiplasty.

21. Thus, according to TMCI itself and unbeknownst to investors during the Class Period, Stryker was able to leverage its status as a medical technology giant by bundling its LapiFuse system in its service line contracts. In this way, the fact that TMCI was solely focused on bunion correction and had no other products to "bundle" actually contributed to the Company's struggle to compete – in sharp contrast to Treace's public statements that a "big diversified player" would be hard pressed to compete with TMCI and its signature product due to the Company's narrow focus on bunion correction. In fact, the opposite was true: Stryker was able to compete with TMCI precisely due to its size and the scope of its portfolio. In effect, Stryker's

practice of bundling LapiFuse with its other, non-bunion related products rendered TMCI's total addressable market share a melting ice cube.

22. Importantly, Stryker began marketing LapiFuse in 2020. This timing is critical because, at that time, LapiFuse was not among the category of Stryker products that were subject to its service line contracts with IDNs. However, as more and more of these contracts came up for renewal *after* 2020, Stryker naturally included LapiFuse in them.

23. Because many of Stryker's service line contracts are subject to three-year terms, 2023 was a pivotal year: by that time, an entire lifecycle of service line contracts had come up for renewal and thus included LapiFuse. In other words, by 2023, the number of healthcare providers that could purchase Lapiplasty without endangering a rebate with Stryker had shrunk considerably.

24. This trend manifested in TMCI's financial results. While the Company was able to report staggering revenue growth in the ten quarters between 2021 (when it completed its IPO) and the second quarter of 2023, that growth began to slow in the third quarter of 2023.

25. Specifically, on November 9, 2023, TMCI released its earnings for the third quarter of 2023, announcing revenues of $40.7 million – an increase of just 23.3% over the same period in 2022 (compared to an increase of 52.9% between the third quarter of 2022 and the third quarter of 2021). Moreover,

despite having guided investors to expect full year 2023 revenues between $191 million to $197 million, TMCI announced a guidance *cut* for 2023 revenue between $182 million to $186 million.

26. Treace explained the poor results and attendant guidance cut as the result of "seasonality," or greater than expected "travel and vacations" from TMCI's patient demographic. In direct response to a question about whether competition was affecting TMCI's results, Treace claimed "that's not what was driving this shift. That's not what's driving the softness in the summer months." However, in reality, competition from SSPs, including LapiFuse, had already begun to constrain Lapiplasty's sales and growth.

27. Rather than acknowledge the impact of competition on TMCI's core business, Treace concealed that truth, continued to downplay it, and, in fact, continued to falsely assert that even though there might be competitors "try[ing] to come in and capitalize on the market that we pioneered and developed," none would actually be able to do so because, according to Treace, there simply was not "a technology that can match Lapiplasty at the surgeon-patient interface . . . . There's just nothing yet that performs like it at the end user interface. . . . It's hard for these larger multi-line companies to keep up with a rapidly innovating, focused company like Treace Medical."

28. But, to conceal this relevant truth, Defendants went a step further. Having badly disappointed investors in the third quarter of 2023, TMCI

needed to restore confidence in the Company's growth story by showing strong results in the fourth quarter. To do so, Defendants engaged in a scheme to artificially boost fourth quarter revenue by pressuring the Company's sales representatives to sell "advanced purchase orders," or "APOs."

29. As numerous confidential witnesses ("CWs") – former employees of Treace Medical – have confirmed, in the fourth quarter of 2023, Company sales representatives were instructed to sell Lapiplasty kits in bulk (packs of 5, 10, 15, 20, etc. kits) at a discounted rate. In short, instead of selling Lapiplasty kits to healthcare providers on an as-needed basis (which need would perhaps not have arisen until the first quarter of 2024 or thereafter), TMCI engaged in a Company-wide push to sell as many Lapiplasty kits as possible in the fourth quarter of 2023 for the express purpose of booking that revenue in that quarter and thereby meeting analyst expectations.

30. That is precisely what occurred, as TMCI reported $62.2 million in revenue in the fourth quarter of 2023, which allowed the Company to report full-year 2023 revenues of $187.1 million – thus beating the revenue guidance it had provided to investors of between $182 million and $186 million.

31. Equipped with these artificially inflated results, Defendants tripled down on dismissing competitive pressure. For example, Treace continued to boast about TMCI's "unique model," which allowed it to "defend

[its] market leadership positions." But Treace knew that competition from SSPs was already undermining that position. Investors did not.

32. Accordingly, the market was shocked in May 2024 when TMCI announced a significant guidance cut and admitted, for the first time, that the reduction was directly related to competition. And not just any competition, but competition from "knockoffs" – a disparaging term for SSPs such as LapiFuse.

33. TMCI stock fell ***62.5%*** in a single day in response to the guidance cut and the revelation that knockoff competition was the reason for it. Analysts were surprised by the guidance cut and by the reasoning. Competition with Legacy Procedures had been assumed, but investors had been repeatedly told that Lapiplasty was in a class of its own and that the potential impact of SSPs was negligible and not a threat to the Company's growth trajectory. That false premise was shattered, and investors realized that Lapiplasty was facing significant competition from SSPs and that, if an IDN or surgeon decided against a Legacy Procedure, it was not going to Lapiplasty alone, but instead to any number of Lapiplasty-like products, such as LapiFuse. Defendants could no longer maintain the false premise that TMCI was continuing to beat its larger, more sophisticated competitors, nor the false premise that the revenue growth of the prior years could continue into the future.

34. Throughout the Class Period, Defendants made materially false and/or misleading statements and failed to disclose adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that competition was negatively impacting demand for Lapiplasty and would continue to do so into the future; (2) that Lapiplasty was not alone in a class of products allegedly superior to the Legacy Procedures, but faced competition from substantially similar products; (3) as a result, TMCI's single product focus was not a competitive advantage in light of larger, more diversified competitors who could offer an SSP at a lower price; (4) competition was a factor in TMCI's results below market expectations during the summer of 2023, not just patient travel and seasonality; and (5) the Company's ability to meet analyst expectations in the fourth quarter of 2023 and the first quarter of 2024 – and thus to keep its growth story intact – was the result of an aggressive push by Defendants to pressure the Company's sales representatives to sell as many Lapiplasty kits as possible, even at the expense of future sales.

35. At the same time, Defendants knew, or were reckless in not knowing, that their statements were materially false and/or misleading. In addition to various admissions made by TMCI in the Stryker Complaint and the Zimmer Complaint, several CWs have confirmed that the Individual Defendants and/or their agents knew, or were reckless in not knowing, about

the impact that SSPs were having on TMCI's market share, that the Company's sole focus on bunion correction was, in reality, a hindrance on the Company's growth prospects, and not an unmitigated competitive advantage, and that Company sales representatives had been instructed to aggressively push APOs for the sole purpose of booking additional revenue in the fourth quarter of 2023 and the first quarter of 2024.

36. Specifically, and as explained in greater detail below, these CWs – stationed in different geographic regions throughout the United States – have confirmed that it was known inside the Company that: (1) Lapiplasty and LapiFuse were indeed "substantially similar" products; (2) competition from SSPs was negatively impacting demand for Lapiplasty beginning in 2023, if not earlier; (3) TMCI was struggling to compete with larger, more diversified competitors who were able to bundle their SSPs in service line contracts with IDNs; (4) as early as October 2023, TMCI's supposed IP advantage and protection was not effective in deterring SSP competition; and (5) TMCI sales representatives were facing "pressure" to sell APOs in the fourth quarter of 2023.

37. As a result of Defendants' wrongful acts, omissions, and the precipitous decline in the market value of the Company's common stock, Lead Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

38. The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5(b) promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5(b)).

39. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

40. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa). TMCI is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of the acts and conduct complained of herein took place within this Judicial District.

41. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A. Lead Plaintiff

42. Lead Plaintiff Special Situations Private Equity Fund, L.P., as set forth in the certification accompanying its Motion for Appointment as Lead Plaintiff (ECF No. 42-1 at 4-6), incorporated by reference herein, purchased

Treace Medical common stock during the Class Period, and suffered damages as a result of Defendants' violations of the federal securities laws and false and/or misleading statements and/or material omissions, as alleged herein. Lead Plaintiff is a limited partnership organized under the laws of the state of Delaware that is part of a larger family of Special Situations funds having a place of business at 527 Madison Avenue, Suite 2600, New York, NY 10022.

**B. Defendants**

43. Defendant Treace Medical is a medical technology company focused on advancing the standard of care for the surgical management of bunion and related midfoot deformities. Treace Medical's common stock trades on the NASDAQ under the symbol "TMCI." At all relevant times, the Company maintained its principal place of business in Ponte Vedra, Florida.

44. Defendant John T. Treace is the founder of Treace Medical, has served as the Company's CEO, and as a member of the Company's Board of Directors (the "Board") since 2014.

45. Defendant Mark L. Hair has served as the Company's Chief Financial Officer ("CFO") since September 2020.

46. Defendants Treace and Hair, because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the

market. The Individual Defendants were provided with copies of the Company's reports alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material, nonpublic information, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading or omitted to state facts necessary to make the statements made, under the circumstances in which they were made, not misleading. The Individual Defendants are liable for the false statements pled herein.

## SUBSTANTIVE ALLEGATIONS

### A. Background

47. Treace Medical is a medical device research, technology, and manufacturing company. Founded in 2014, the Company remained privately held until April 2021 when it completed its IPO. According to the Company, its primary goal is to advance "the standard of care for the surgical management of bunion and related midfoot deformities."

48. TMCI's primary product is Lapiplasty – a combination of instruments, implants, and surgical methods designed to surgically correct three planes of the bunion deformity (i.e., it is a "3D" procedure) and address

the root cause of the bunion. TMCI markets and sells its bunion correction products in the United States, primarily through a direct employee sales force.

49. Bunions (hallux valgus) are a painful, disfiguring deformity characterized by a deviated position of the big toe.

50. Historically, surgeons have utilized one of two bunion correction methods: the Legacy Procedures. The first and most common approach is the metatarsal osteotomy, which involves cutting and shifting the metatarsal bone in two dimensions. While this "2D" procedure allows for a relatively quick return to weight-bearing activities (typically within days to a couple of weeks of the procedure), it is, according to TMCI, "primarily a cosmetic fix" that fails to correct the root cause of the bunion. Accordingly, osteotomy surgery results in high rates of long-term bunion recurrence and therefore low patient satisfaction; according to Treace, the osteotomy "does nothing to address the unstable joint [i.e., the root cause], which again is the origin of this deformity and fails to reliably address the important rotational component."

51. The second of the Legacy Procedures, traditionally reserved for the most severe bunion cases, is Lapidus Fusion surgery. While the Lapidus Fusion surgery fuses the unstable joint, it is a demanding, freehand surgical technique that requires the surgeon to perform complex corrections without the benefits of assistive instrumentation that are standard in many other

orthopedic procedures; consequently, Lapidus Fusion surgery results in inconsistent outcomes. At the same time, given the invasive nature of the procedure, it results in protracted recovery times – often requiring six to eight weeks in a cast. According to Treace, Lapidus Fusion surgery is "a much more technically challenging and sometimes even volatile freehand operation and one that is not historically focused on correcting the important rotational component of the deformity." Further, according to Treace, Lapidus Fusion surgery is a "hard sell to patients, as it involves a much longer and more restrictive recovery than an osteotomy, with up to six to eight weeks non-weight bearing and often in a cast."

52. Since 2014, TMCI has marketed Lapiplasty as a superior method of bunion correction that comes without the complications, inconsistencies, and extended recovery time associated with one or both of the Legacy Procedures.

53. In pre-Class Period statements, Treace repeatedly emphasized the "disruptive" nature of Lapiplasty, asserting that the Company was having great success targeting the "$5 billion plus addressable market in the US" by receiving "strong early adoption from the foot and ankle surgeon community." Part of this success, Treace boasted, was due to TMCI's "strong intellectual property, compelling clinical datasets, and . . . the industry's only bunion-focused direct sales channel."

54. As Treace described it, Lapiplasty offers a "3D" approach to bunion correction that "allows a surgeon to correct all three planes of this complex deformity and address the root cause of the bunion by fusing the unstable joint in the middle of the foot." According to Treace: (1) Lapiplasty can be performed on a wide range of patients with bunion deformities in the hospital outpatient or ambulatory surgery center; (2) Lapiplasty allows the surgeon to stabilize the Tarsometatarsal joint ("TMT" joint), thereby eliminating the unsightly bump and restoring normal anatomy; and (3) Lapiplasty allows the patient to quickly return to weight-bearing activity.

### B. Between 2020 and 2022, Lapiplasty Enjoys Initial Commercial Success, and TMCI's Stock Price Soars

55. Lapiplasty received 510(k) clearance to begin sales from the Food and Drug Administration in March 2015, and completed its first commercial sale that year.

56. According to Treace, Lapiplasty was designed to "address[] a market where there is a large unmet need," estimating that while there are over 1 million candidates for bunion surgery in the United States each year, only 450,000 were actually receiving surgical treatment each year.

57. When first introduced, Lapiplasty was considered a significant improvement over historical bunion treatment options, and was indeed initially successful in competing against the Legacy Procedures. In 2020,

TMCI sold 11,113 Lapiplasty kits; in 2021, 17,490; and in 2022, 24,656, representing a compound annual growth rate of 49.0%. Given that TMCI's revenues were driven by Lapiplasty – its main product – revenues likewise grew from $57.4 million in 2020 to $141.8 million in 2022, a compound annual growth rate of 57.2%.

58. Although Lapiplasty had enjoyed competitive success against Legacy Procedures, it remained a relatively small portion of the overall bunion surgery market. But, as Treace emphasized in mid-2023, while TMCI only enjoyed "6% of the procedure base" (i.e., the overall market), the Company had "a long way to go." That is, given the 1.1 million potential surgical candidates, Treace portrayed TMCI as having "a long runway" for potential future sales, and the Company's growth from 2020 to 2022 suggested that Lapiplasty was indeed penetrating the market.

59. The chart below sets forth TMCI's reported revenue between 2019 and 2022:

| Reporting Period | Reported Revenue (in thousands) | % Change Over the Same Period in the Previous Fiscal Year |
|---|---|---|
| **FY 2019** | 39,416 | |
| **FY 2020** | 57,365 | 31.3 |
| **Q1 2021** | 18,707 | 66.2 |
| **Q2 2021** | 20,654 | 166.9 |
| **Q3 2021** | 21,619 | 51.5 |
| **Q4 2021** | 33,439 | 38.7 |
| **FY 2021** | 94,419 | 64.6 |
| **Q1 2022** | 29,047 | 55.3 |
| **Q2 2022** | 29,967 | 45.1 |
| **Q3 2022** | 33,055 | 52.9 |
| **Q4 2022** | 49,769 | 49.1 |
| **FY 2022** | 141,838 | 50.2 |

60. In the midst of this explosive growth, TMCI completed its initial public offering in 2021, tapping the capital markets for the funding needs of a pre-profitable company. However, because TMCI was *not* profitable at this time (or at any time during the Class Period), the Company needed to continue to demonstrate consistent and sustainable growth to facilitate much needed access to the capital markets in the future, either to raise equity or debt funding, until profitability could be achieved.

61. Pre-Class Period in 2023, TMCI again accessed the capital markets, issuing $107.5 million of common stock. At this time, the Company remained unprofitable and thus would need to find a runway to profitability before it ran out of cash. In the alternative, the Company would need further access to the capital markets. To do so, Treace needed to convince investors that the Company had such a runway to profitability.

### C. Before and During the Class Period, TMCI Portrays Itself and Lapiplasty as "Differentiated" Market Leaders

62. For years, TMCI positioned itself as a leading disruptor of the bunion surgery industry, and, indeed, TMCI's growth was disruptive: every Lapiplasty done was one less of the Legacy Procedures done. As set forth above, TMCI experienced considerable compound annual growth rates, both in terms of sales and revenue, between 2020 and 2022.

63. Given Lapiplasty's growth against the Legacy Procedures in 2021 and 2022, and Treace's consistent message that the Company had a runway to profitability, investors and analysts expected significant growth going into 2023 as well. Accordingly, in March 2023, the Company provided a full year 2023 revenue guidance range of between $187 million and $193 million, approximately 32% to 36% growth over TMCI's 2022 revenue.

64. As a pre-profitable company, TMCI's investors were intensely focused on the Company's ability to demonstrate sustainable revenue growth.

To demonstrate such growth in an environment where each surgery involves the use of one product, one time, TMCI needed to also demonstrate that it had the ability to compete with, and win against, potential competitors over the long run.

65. As a result, during the Class Period, Treace was repeatedly asked by analysts on earnings calls and at industry conferences about the competitive dynamics of the bunion correction market. To allay investor concerns, Treace harped on two key factors that differentiated TMCI from its competitors: (1) that Lapiplasty was superior in quality, and (2) that TMCI had the right business model. In short, competition was no issue precisely because Lapiplasty was superior and TMCI had the right business model.

66. ***First***, TMCI and Treace repeatedly emphasized the "unmatched" and "differentiated" quality of Lapiplasty, thus implying to the market that Lapiplasty was not only better than the Legacy Procedures and potential SSPs, but ***uniquely*** better and indeed the market leader in quality. TMCI and Treace further implied that the strength of TMCI's IP insulated the Company from potential competition. Treace went as far as to state – on several occasions – that TMCI's "biggest competitor" was not a fellow medical device manufacturer but instead surgeon ignorance about the efficacy of Lapiplasty; in Treace's words, one of the things preventing the Company from "going from 6% [market share] to 12% overnight" was the "historic dogma in

the training centers for foot and ankle" "that the majority of your bunion procedures ought to be metatarsal osteotomies."

67. ***Second***, TMCI and Treace repeatedly portrayed TMCI's narrowly focused business model as a competitive advantage over larger, more diversified medical device manufacturers. Specifically, TMCI and Treace led the market to believe that TMCI was uniquely positioned to dominate the bunion correction market because bunion correction was the Company's only focus; larger competitors with more diversified product lines, and less focused R&D departments and sales forces, would therefore always be playing catchup.

68. Attempting to convince the market of these twin factors, between May 8, 2023 and continuing through and including February 27, 2024, Defendants made a series of false or misleading statements downplaying or outright rejecting the possibility that the entry of new competitors into the market presented a serious or imminent threat to TMCI's growth story.

69. On May 8, 2023, TMCI held its earnings call for the first quarter of 2023 (the "Q1 2023 Earnings Call"). In response to a question from a J.P. Morgan analyst about competition – specifically about what TMCI's "reps are seeing out in the field" and whether "any of the competitors are impeding [TMCI's] ability to grow" – Treace responded:

> There are other products in the marketplace being offered from other companies. Most of these are kind of ***highly diversified companies with large bags of products***. We're not really seeing any incremental, I think, opposition to our momentum coming from these. In some ways, they're just further validating what we started and what we developed long ago. Any of these companies' products and offerings get like a ***fractional portion of their sales team's time and attention***. And what we found is with over nearly eight years of refinement, ***Lapiplasty is just so elegant and reproducible, it's frankly just unmatched in performance at the doctor patient interface***. And we continue to wrap more patents around what we're doing, making it a little more challenging for companies to make something that can truly replicate the elegance of Lapiplasty. So, on top of that, our direct sales channel, our training programs, our patient advocacy through our [direct-to-consumer program] are real clinical outcomes data that we can back up our product with. It just further differentiates us in the market, but ***I can't say that there is any one of these multi-line distracted companies that's slowing our business momentum***.

70. To be sure, the content of Treace's remarks on the Q1 2023 Earnings Call was not materially different from what Treace had always told the market before the Class Period: in short, that Lapiplasty was far superior to the competition; competition from larger companies with "distracted" sales forces was not a threat to the Company's long term growth profile; TMCI's sole focus on bunion correction was a competitive advantage; and TMCI's IP insulated the Company from potential threats. Treace's consistent reassurances that competition was not impacting TMCI's growth were credible and important to investors and analysts who had seen Lapiplasty successfully seize market share from Legacy Procedures. The market had every reason to accept this narrative. As a J.P. Morgan analyst summarized:

"Treace [Medical] provided decent 1Q results after the close, with sales coming ahead alongside in-line adj. net loss, and guidance moving up by the size of the beat. 1Q23 sales of $42.2M (+45%) came in better than the Street at $39M, with growth driven by increases in procedure volumes and ASPs."

71. Despite the consistency of Treace's messaging before and during the Class Period, the facts on the ground had changed during this time, rendering that messaging false and/or misleading. Indeed, based on TMCI's own allegations in the Stryker Complaint and the Zimmer Complaint, as well as statements from several confidential witnesses – former employees of TMCI – Defendants knew, or were reckless in not knowing, that by May of 2023, cracks in the Company's narrative were beginning to emerge.

72. Specifically, Defendants were aware, at least as early as 2023, that (1) Lapiplasty was not "unmatched in performance"; (2) TMCI was already seeing the impact of competition from SSPs; and (3) TMCI's business model was a hindrance to – and not a contributor to – TMCI's growth profile. According to CW-3, LapiFuse was "substantially similar" to Lapiplasty, and LapiFuse was essentially a "me too" product. Likewise, according to CW-5, it was "100%" true that TMCI was beginning to see competition from "knockoff" products – including from Stryker's LapiFuse and other SSPs – in 2023, if not earlier. More specifically: "There was already serious, legitimate competition in 2022 – the same as 2023," according to CW-5. Nevertheless, Defendants

continued to mislead the market about these critical facts throughout the Class Period.

73. Two days after the Q1 2023 Earnings Call on May 10, 2023, the Individual Defendants attended and spoke at the Bank of America Healthcare Conference (the "BAML Conference"). The host, a Bank of America medical device analyst, asked the Individual Defendants about the "competitive environment," and whether the clinical data that the Company had developed – i.e., the results of its ALIGN3D Study – gave the Company a "competitive edge" in marketing the product to foot and ankle doctors. Treace responded, in relevant part:

> We have an expert sales force. We have a big fleet of clinical specialists out to make sure [surgeons'] first cases go really, really well . . . . So, I think the clinical data foundationally serves a lot of purposes for us. And it does help us when we're trying to break into larger, tougher IDN networks, hospital groups, that we do have the clinical evidence. . . . Broadly or in general, the competitive landscape, ***the way we look at the competition is our biggest competitor is changing the mindset of doctors*** applying the osteotomy procedure to 70% or more of their cases. So we're more focused on changing the doctor's perspective on what procedure or what technique to use versus what competitors should we try to displace or what competitors trying to get at our business. That said, there are companies out there with products that are – they're saying are like Lapiplasty. . . . We're not discounting [competitors'] products, but ***they're highly diversified companies***. The reps have big bags of products and ***this is just another in the bag and it's going to get a fraction of their time***. [TMCI] is a company with ***over 400 people that only do this all day long. We're way out ahead and we innovate and iterate so rapidly on our product that it's hard not to be shooting behind if you're a competitor***, because we'll already be ***two or three generations ahead when [competitors] get to market. So it's hard to compete with a***

> ***highly focused company that's so far ahead and moving that fast if you're a big diversified player***.

74. Treace's statements at the BAML Conference encapsulate the materially misleading picture of the Company's future prospects that Defendants would continue to portray throughout 2023 and early 2024.

75. ***First***, when analysts questioned whether Lapiplasty would be able to maintain its competitive footing in light of potential market entry from new SSPs, Treace swiftly discounted such concerns, leaving the impression that Lapiplasty was in a class of its own; that TMCI's "biggest competitor" was the "mindset of doctors" (i.e., surgeon ignorance about the efficacy of Lapiplasty vis-à-vis Legacy Procedures); that TMCI was "way out ahead" of other device manufacturers; and that, even if a competitor was marketing an SSP, by the time such SSP even reached the market, TMCI would "already be two or three generations ahead." Treace's remarks provided the misleading impression that if TMCI was able to effectively market its products within the medical community, then there would be no meaningful barriers to widespread acceptance of Lapiplasty: if a surgeon chose to upgrade from a Legacy Procedure, it was a near foregone conclusion that the surgeon would choose Lapiplasty because the competition would always be "shooting behind."

76. ***Second***, when analysts questioned whether and how TMCI could compete with far larger and better capitalized multiline manufacturers (such

as Stryker), Treace answered that the ability to focus on one bunion product was far better than having a bunion product among many other products. The specialized and focused work force at TMCI who "only do this all day long" would provide an advantage in a head-to-head against a competitor whose employees only spend "a fraction of their time" on bunion correction.

77. These representations were critical to the market's analysis of TMCI. Writing in May 2023, one J.P. Morgan analyst (who made similar statements throughout the Class Period), summarized the investment thesis for TMCI:

> Treace [Medical] stood out among the class of recent MedTech IPOs in 2021, with consistent execution and continued momentum in Lapiplasty adoption driving solid top-line results. Treace[ Medical's] innovative solution for bunion correction should enable the company to continue capturing share from legacy procedures, with a differentiated product offering and solid IP setting the company apart from orthopedics peers. In addition, the company's growing portfolio of ancillary products enables the company to become a one-stop shop for bunion procedures, neutralizing the advantage of Treace[ Medical's] larger competitors.

78. As set forth below, Defendants made similar materially misleading statements throughout the remainder of 2023 and into 2024, and continued to portray the Company as having a long runway of potential future sales. In fact, in connection with its earnings release for the second quarter of 2023 in August of that year, the Company raised its revenue guidance from $191 million to $197 million. Following the release of second quarter results, a J.P.

Morgan analyst summarized the results as follows: "[TMCI] provided good 2Q results after the close, with sales coming in a step ahead and guidance moving up by the size of the beat. 2Q23 sales of $42.0M (+40%) came in better than the Street at $40.8M, with better kit volumes driving the upside relative to our own forecasts despite a sequential step down in ASP and surgeon adds."

79. On August 16, 2023, the Individual Defendants attended the UBS Genomics 2.0 and Medtech Innovations Summit (the "UBS Summit"), where Treace was asked by a UBS analyst about the competitive landscape; specifically: "How has the landscape evolved? Some of these larger ortho-focused players have made acquisitions here. What are you seeing, broadly speaking, from a competitive perspective?" Treace confidently responded:

> Obviously, we've created a lot of excitement in the space. And as we built the company and developed the company, there are a lot of great minds at the board level that have been helping us strategically. And we built this company very intentionally knowing that if we're successful, ***people are going to – want to try to come in and capitalize on the market that we pioneered and we've developed***. So we've had several competitors, core competitors out there in the marketplace for the last several years, one introduced in early 2020 from a major player. I don't think that product has changed in form or design to this day. In the same time, Treace Medical has changed its instrumentation and its implants three times. . . . ***So I think it's really hard for these multi-line*** – and these are excellent companies. We have tremendous respect for them, by the way. ***But just the reality of all the product lines they're carrying and the salespeople that have to go in with a very large bag of items and try to target this one procedure that we are absolute experts in. And we haven't seen a technology that can match Lapiplasty at the surgeon-patient interface yet.*** With eight years of just rapid iteration and improvement, Lapiplasty is so refined. ***There's just nothing yet that***

> ***performs like it at the end user interface. And you combine that with all the expertise we have, all the support we put around these doctors with education and informing patients and our direct channel and the clinical data. It's hard for these larger multi-line companies to keep up with a rapidly innovating, focused company like Treace Medical***.
>
> . . .
>
> Because there's only one Lapiplasty by definition, it's a patented method. It's a registered trademark of Treace Medical. ***There is no substitute***.

80. Despite Treace's cavalier assertions that "larger multi-line companies" would struggle to "keep up" with Lapiplasty (for which there was "no substitute"), in the third quarter of 2023, TMCI reported disappointing results and fell short of estimates. As J.P. Morgan observed in connection with the Company's November 9, 2023 earnings release: "3Q23 sales of $40.8M (+23%) fell short of the Street at $42.1M."

81. Having missed analyst estimates, and with their growth story in jeopardy, Defendants had to explain the miss. Indeed, Defendants were feeling the pressure from investors and analysts; according to CW-2, in various monthly sales conference calls (some of which Treace personally attended), CW-2's superior – Aaron Berutti, Senior Vice President, Sales – stated that Treace was "getting pressure from Wall Street" to "hit these numbers." Another of CW-2's superiors told CW-2 that the sales force was

"under so much pressure to hit these numbers that [Defendants are] promising Wall Street – I don't think there's any way we're going to hit them."

82. Accordingly, TMCI held its earnings call for the third quarter of 2023 on November 9, 2023 (the "Q3 2023 Earnings Call"). Despite having previously raised its full year 2023 revenue guidance from $191 million to $197 million just three months earlier, the Company announced a guidance *cut* from $182 million to $186 million. Defendants explained the rationale for the guidance cut as simply the result of unexpectedly high "summer seasonality"; as Treace stated in his opening remarks:

> We are updating our full year 2023 revenue guidance to $182 million to $186 million, which at the midpoint reflects an increase of 30% over 2022 revenue. There are two main reasons that are driving this guidance change: ***first, our year-to-date surgeon count is lower than anticipated due to prioritized travel and vacations from our patient demographic that started in the second quarter and continued through most of the third quarter***. As a reminder, we typically see a large step-up in Q4 bunion procedures, which concentrate heavily at year-end, primarily due to insurance deductibles being met.

83. Later in the call, Hair expressed his "surprise[] by that summer seasonality," which was "more pronounced than we had expected" and which was "why the case volumes were down in Q3." Nevertheless, Treace continued to champion the Company's unique position as a market leader and its "rapidly growing direct sales force, one that's 100% focused on bunion and related midfoot surgery, the only such organization that we're aware of in the

US medtech industry," which Treace stated has "contributed meaningfully to our revenue and market penetration over the past years."

84. Analysts pressed Treace about the soft Q3 results and questioned whether they might be the result of increased competition: for example, an analyst from Morgan Stanley asked "just what essentially gives you the confidence that this is truly a seasonality aspect? . . . [W]hy are you so confident that it's seasonality and not any competitive entry or changes in the landscape being – becoming more of a problem in capturing surgeon mind share or any incremental procedures?" Treace responded, in part:

> ***We're way out ahead, and we've got the best technology***. New entrants will continue to come into the market, but we've got a pretty powerful offense. Our rapid innovation, our focus, our direct sales channel, and then this patient advocacy that we drive through our [direct to consumer marketing]. ***So when – will competition be there and continue to be there? Yes, it has been and it will continue to. But that's not what was driving this shift. That's not what's driving the softness in the summer months.*** This was a real and dramatic shift in the way our patient demographic, the 30- to 60-year-old female in the US behaved this year. And the headlines, you can see it all over the place. International travel, my wife was quite upset with me because I think we're the only people we don't know that didn't go to Europe at least once this year. ***And it was bottled up, four years of pre-COVID plans that all came piling into this year once the COVID restrictions left, and that demographic behaved differently probably than other companies' demographics.***

85. Thus, Treace told investors that the Company's poor third quarter results were the result of an unexpectedly high volume of summer travel from its core demographic. When asked if the results had anything to do with

competitive pressure, Treace was clear: no. The "softness" was from their patients' "prioritized travel." To bolster the claim that seasonality and travel plans caused the Q3 miss, Treace gave the market an anecdote about his wife wanting to go to Europe, which everyone else was apparently doing in light of the easing of COVID-19-related travel restrictions.

86. Several days later, on November 14, 2023, Treace made a series of similarly misleading remarks at the Stifel Healthcare Conference Fireside Chat (the "Stifel Healthcare Conference"). Treace was asked by a Stifel analyst to "revisit[]" "concerns . . . from investors"; specifically: "was there any aspect of third quarter performance that reflected greater threats or competition from new – from current competitors? Anything new in the market just at a high level before we get into some of the specifics that leave you at all incrementally concerned?" Treace, once again, dismissed the talk of potential competition:

> No, great question. And we talk about this market that we've created, it's very large, over $5 billion in the US, and we're only 6% penetrated. We've made it very exciting. We've made companies have to respond. ***Competition is nothing new for us.*** We've been dealing with Stryker and J&J and others for the past several years in this marketplace. As more companies enter the space, we have a significant patent portfolio, 52 patents that a lot of these companies have to navigate around. ***And it's hard to produce something that at the user and interface between the patient and doc performs like Lapiplasty. But there's more noise out there. There will continue to be more noise.*** We've got an incredibly strong offensive strategy that we continue to execute with our direct channel, product innovation, patient awareness, DTC. And we're the only product out there,

> commercial product, serving the bunion market that has significant clinical data to back it up. ***So, although there's competition out there, we didn't see anything material – materially increasing its impact in Q3 nor do we see it in Q4. What happened in Q3 was predominantly this seasonal shift in the way patients behave this year. That was unique.***

87. Thus, Treace presented a state of affairs that was essentially unchanged: the level of competition that TMCI was seeing was "nothing new," and any discussion of traction that potential competitors might be gaining was just "more noise." Rather than acknowledge that the inroads that Stryker was making were more than just noise, Treace again obscured the possibility and instead blamed the Company's soft third quarter results on a "unique" "seasonal shift."

88. Post-Class Period developments – based on admissions from TMCI itself – make clear that the Company's weak third quarter 2023 results were not simply the result of "seasonality," but of a far more fundamental threat to the Company's long term competitive position.

### D. <u>Beginning in 2023, The Impact of Stryker's Service Line Contracts Began to Fundamentally Undermine TMCI's Competitive Position And "Runway" of Future Sales</u>

89. TMCI's growth was dependent on the truth of two claims that TMCI and Treace repeatedly made throughout the Class Period: (1) that Lapiplasty was a differentiated and superior product when compared with Legacy Procedures and SSPs such that Lapiplasty could compete with and

win against these products over the long run, despite the higher price tag associated with Lapiplasty; and (2) that TMCI's business model – focused solely on bunion correction – was supportive of the Company's ability to compete against larger, more diversified companies. More specifically, because Lapiplasty was expensive compared to the Legacy Procedures and SSPs, TMCI told the market that the expense was worth it because Lapiplasty was simply better and more effective than the alternatives. But that calculus only held if the quality of Lapiplasty truly *was* worth that expense in light of its quality; if the quality of Lapiplasty was *not* worth the additional cost, patients and surgeons would look elsewhere for bunion treatment.

90. Competition for bunion surgery products plays out in two kinds of markets, those within Integrated Delivery Networks, and those outside of IDNs. According to TMCI:

> IDNs are groups of healthcare providers such as hospitals, ambulatory surgical centers, and other outpatient care facilities that collectively provide comprehensive and "integrated" customer care for virtually all types of procedures and healthcare needs. More than half of instrumented TMT bunion procedures nationwide are performed at an IDN-affiliated hospital or surgical center, with the vast majority of the remaining procedures performed by independently owned surgical centers, i.e., that operate outside of IDNs.[4]

[4] Stryker Complaint ¶ 133.

91. TMCI's commercialization strategy heavily focused on direct marketing and sales of Lapiplasty to surgeons and other practitioners, some of which worked in healthcare facilities associated with an IDN, while other facilities were independent. In the ideal scenario for TMCI, the IDN-associated facilities would purchase Lapiplasty for its bunion correction needs, while purchasing other, non-bunion related products from other medical device manufacturers, such as Stryker. However, as time went on, this scenario was playing out less and less.

92. On October 14, 2024, TMCI filed a lawsuit against Stryker and its subsidiary Wright Medical Technology ("Wright") for patent infringement and violations of the antitrust laws, among other things. In the Stryker Complaint, TMCI itself asserted numerous facts about the manner and effect of Stryker's competition with TMCI, and the gradual – yet undisclosed – impact that it was having on TMCI's ability to market and sell Lapiplasty.

93. In November 2020, Stryker acquired Wright and its portfolio of medical device technologies, including Wright's bunion correction product – LapiFuse – which Wright had introduced in early 2020. Despite TMCI's and Treace's portrayal of Lapiplasty as far superior to LapiFuse and other SSPs during the Class Period, in its 200-page Stryker Complaint, TMCI argues – in painstaking detail – that LapiFuse is a "copycat" and "knockoff" of Lapiplasty.

94. The timing of Stryker's acquisition of Wright is relevant to the manner in which LapiFuse competes with Lapiplasty. Prior to the acquisition, Wright was a standalone company with comparatively fewer service lines than Stryker. According to TMCI, "[b]y August 2020, the LapiFuse System had achieved only minimal traction."[5] To alter LapiFuse's trajectory, TMCI states that "Stryker further focused on bundling the LapiFuse System within agreements for its unrelated trauma service line."[6] That is, to break into the bunion correction market, Stryker began to "bundle" LapiFuse in its service line contracts with IDNs. As TMCI explains the concept of service line contracts:

> IDNs include an administrative purchasing department that manages the supply chain for the facilities throughout its network. A medical equipment supplier such as Stryker or Treace Medical generally has to be "on contract" to conduct business within the hospitals and facilities of the IDN. Such a contract [i.e., a "service line contract"], in effect, ostensibly provides the supplier a "license" to provide their products to departments and surgeons within the IDN. . . .
>
> IDNs often directly negotiate contracts with medical device and equipment suppliers for categories of products, often referred to as "service lines." . . . .
>
> Where a service line is covered by a bundled service line contract, the IDN agrees on behalf of all of its facilities to purchase a certain percentage (typically 80%–90%) of specified products quantified by annual spend within those service lines from the contracted supplier. On-contract competitors to a bundled service line

[5] *Id.* ¶ 131.

[6] *Id.*

> supplier can still sell products covered by the bundled service line agreement, but are collectively limited with all other such suppliers to the remaining 10% – 20%. . . .[7]

95. In other words, service line contracts require the IDN to purchase – and thus, all medical providers within the IDN to use – a substantial majority of products from a particular medical device manufacturer, such as Stryker. In exchange, the manufacturer will offer the IDN a "substantial rebate of 3% - 5% on all purchases . . . if the IDN achieves the required percentage of purchases within the covered product service line(s)."[8]

96. As TMCI alleges, Stryker "almost exclusively sells through bundled service line agreements."[9] Indeed, Stryker "has bundled trauma service line agreements with 80% or more of IDNs,"[10] and monitors and enforces "individual healthcare facilities' compliance with the bundled service line agreement."[11] In particular, "as part of the standard 'request for proposal' or 'RFP' process, Stryker identifies the products that are competitive with those covered by the bundled service line agreement by product number or 'stock keeping unit' ('SKU')" and if, for example, "a competitive SKU is

---

[7] *Id.* ¶¶ 134-137.

[8] *Id.* ¶ 144.

[9] *Id.* ¶ 156.

[10] *Id.*

[11] *Id.* ¶ 144.

identified as corresponding to a Stryker product within the bundled service line agreement, that product counts against the IDN's rebate-eligible percentage."[12] Therefore, "every dollar spent" on a non-Stryker product (such as Lapiplasty) "counts against the remaining 10%–20%" of non-Stryker products that the IDN may purchase without "endanger[ing] the bundled discount."[13] Thus, an IDN that uses non-bunion Stryker products has an incentive to use LapiFuse (and/or other Stryker bunion products) over Lapiplasty.[14]

97. This strategy of bundling products is not available to an effectively single product company like TMCI. TMCI cannot compete in this manner because it does not offer other, non-bunion products – its sole focus on bunion correction forecloses this option.

98. Thus – in light of Stryker's service line contracts and the considerable rebates afforded to the provider for using Stryker products – the only way that TMCI would be able to compete with LapiFuse over the long run was if Lapiplasty was truly worth it from a quality and economic

[12] *Id.*

[13] *Id.* ¶ 188.

[14] *Id.* ¶ 132.

perspective; i.e., if the quality of Lapiplasty was so superior to LapiFuse as to justify the additional cost and potentially lost rebates.

99. But Lapiplasty was not of such superior quality. Indeed, confidential witnesses have confirmed that Lapiplasty was of similar quality to LapiFuse. CW-6 reported being told by several surgeons who had adopted LapiFuse that they "just didn't see" how Lapiplasty was "better at all"; likewise, CW-3 referred to Lapiplasty and LapiFuse as "substantially similar," going as far as to say that LapiFuse was a "me too product."

100. The nature and contractual terms of Stryker's service line contracts meant that the downside effect to TMCI would only ever increase at an exponential rate – that is, once Stryker entered the picture, TMCI's business model was effectively doomed because the number of service line contracts that included LapiFuse was only increasing, and never decreasing. Specifically, and as TMCI admits on information and belief:

> Stryker's trauma service line agreements typically have an initial term of 3 to 5 years and can be extended for additional years. . . . Stryker uses each new proposal, renewal, or extension to add [Stryker's bunion related products] within the bundled products comprising the trauma service line.[15]

101. Simply put, with each renewal or extension of a service line contract after 2020, Stryker was including LapiFuse. For example, if one of

---

[15] *Id.* ¶ 192.

Stryker's service line contracts was entered in 2018 and had a three-year term, it came up for renewal in 2021; although LapiFuse would not have been included in the 2018 agreement, it certainly would have been included in the 2021 revision. Thus, with each passing year after 2020, the number of potential medical providers that were able to purchase Lapiplasty without running afoul of a service line contract with Stryker was shrinking; in effect, TMCI's total accessible market share was a melting ice cube.

102. Although this dynamic was beginning to play out between 2020 and 2022, 2023 was the pivotal year: if the initial term of a service line contract was three years, the result was that even agreements entered into immediately before Stryker acquired Wright in 2020 came up for renewal in 2023; contracts with five year terms likewise came up for renewal in 2023 if they were entered into as far back as 2018.[16] TMCI admits as much: "As more IDN contracts come up for renewal and Stryker has additional opportunities to coerce IDN purchasing departments to include [Stryker's bunion-related products] in their trauma service line bundles, Stryker's market share will only increase."[17] Further, according to TMCI:

[16] It is unclear what percentage of Stryker's service line contracts contain three-year versus five-year terms. According to TMCI, Stryker's service line contracts contain strictly enforced confidentiality provisions relating to their bundling and rebate practices. *See* Stryker Complaint ¶ 193.

[17] Stryker Complaint ¶ 173.

> With each new agreement or renewal as [Stryker's] prior contracts come due for renewal, ***this market foreclosure grows*** as Stryker continues to ***make it impossible*** for . . . competitors such as Treace Medical to compete on the merits within a substantial portion of the relevant market. ***Treace Medical has seen this repeatedly as it is forced out*** of or sees its cases diminished in hospitals and surgical centers where it previously had a relationship and has faced ever-increasing roadblocks in breaking in with new IDN customers that would otherwise have been strong, primary customers.[18]

103. By its very nature, this process has been occurring since Stryker's acquisition of Wright. And yet, despite telling investors for over a year that they had seen essentially no change in the competitive environment, TMCI now admits that it cannot directly compete with Stryker, due to its service line discounts, because TMCI "cannot offer a low enough price to offset the entire total bundled rebate" and "cannot profitably" compete with Stryker's bundled service line "because the total rebate [for Stryker products] ***far exceeds any reduction in price*** that could be available from an equally efficient Stryker competitor."[19]

104. Indeed, TMCI now admits that "[b]ut for" Stryker's service line bundling, the Company "certainly could have sold more Lapiplasty Systems."[20] In TMCI's own words:

---

[18] *Id.* ¶ 229.

[19] *Id.* ¶ 201.

[20] *Id.* ¶ 226.

> Prior to Stryker's trauma service line bundling . . ., Treace Medical had achieved substantial success in obtaining carve outs within numerous IDNs based on the unique and non-substitutable features of the Lapiplasty System. Since Stryker began targeting Treace Medical with bundles, rebates, and other conduct at IDNs, Treace Medical has been ***foreclosed*** from competing on the merits at numerous IDNs.[21]

105. To be sure, TMCI was selling Lapiplasty profitably, so reduced sales equated to reduced profits. That is, because TMCI had capacity to "substantially and quickly increase its production and distribution of the Lapiplasty System without incurring significant additional fixed costs,"[22] increased sales would have resulted in additional margin and profit to TMCI; as TMCI admits, "each additional Lapiplasty Procedure increases Treace Medical's per-procedure margin."[23] It was Stryker's competition, and not production or distribution limits, that negatively impacted TMCI's sales of Lapiplasty.

106. TMCI has admitted specific instances of loss of revenue to TMCI's competition due to service line bundling, including the following examples which are based on TMCI's discussions with "[s]urgeons and IDN administrative staff who have been willing to discuss the decision-making process and rationale":

---

[21] *Id.* ¶ 181.

[22] *Id.* ¶ 60.

[23] *Id.*

- "One surgeon who performed 27 Lapiplasty Procedures in the prior year was forced to switch to the LapiFuse System when their hospital system switched to a Stryker trauma service line bundle including [Stryker's bunion products]. Since the hospital system forced the LapiFuse System on the surgeon, he has performed no Lapiplasty Procedures."

- "A prominent surgeon in a prominent system has been aggressively hounded by IDN administration to use the LapiFuse System instead of the Lapiplasty System, because the LapiFuse System is included in their trauma contract. They have been told to use the LapiFuse System despite not receiving any training on that system and despite repeated responses to hospital administration explaining the differentiated results of the Lapiplasty System versus the LapiFuse System."

- "A prominent surgeon and leader of a prominent foot and ankle organization scheduled a Lapiplasty Procedure well ahead of time. On the morning of the surgery after the patient arrived, the surgeon was told he could not use the Lapiplasty System and was forced to use the LapiFuse System, without any consultation regarding relative efficacy for the patient. The LapiFuse System was under a Stryker trauma contract."

- "A large surgery group of 8-10 surgeons that had used the Lapiplasty System for years was told they would no longer be allowed to use the Lapiplasty System due to the IDN's trauma contract with Stryker."[24]

107. According to TMCI, the surgeons and IDN administrative staff they spoke with "have almost universally confirmed that bundling . . . was the primary basis for [IDNs] being forced away from permitting surgeons to use the Lapiplasty System."[25] TMCI similarly admits that "IDN purchasing departments have rejected offers by Treace Medical to sell the Lapiplasty

[24] *Id.* ¶ 194.

[25] *Id.* ¶ 194.

System at substantial discounts because Stryker has [bundled its SSP, Lapifuse] and tied [Stryker products] to the associated rebate program."[26] In short, "many hospitals and surgeons have informed Treace Medical that they could not purchase the Lapiplasty System because of trauma service line contracts with Stryker."[27] CW-4 has confirmed the same, stating that TMCI lost business to Stryker "mainly because of contracts," and that Stryker would use its contracts to "block out some of our stuff." Likewise, CW-5 recounted an inability to market products in any hospitals in CW-5's geographic region because Stryker was a "preferred vendor."

108. TMCI has identified specific customers where it has lost revenue to Stryker's competition, naming Ascension Health, Cleveland Clinic, Intermountain Health Care, and Lovelace Health System.[28] The harm to TMCI's business, according to TMCI, is not "speculative, remote, or tenuously connected" to Stryker's competition.[29]

109. This dynamic was not disclosed to investors during the Class Period, and investors did not have access to the relevant facts through any publicly disclosed means. According to TMCI, Stryker's service line contracts

---

[26] *Id.* ¶ 202.

[27] *Id.* ¶ 236.

[28] *Id.* ¶ 232.

[29] *Id.* ¶ 244.

contain strictly enforced confidentiality provisions relating to their bundling and rebate practices.[30] Investors would not have been privy to the bundling information as a result of this confidentiality and would not have known the impact the contracts were having on TMCI's ability to compete.

110. However, the impact that service line contracts was having on TMCI's ability to compete was not unknown to TMCI during the Class Period. For one, TMCI admits to having ***unique*** and extensive knowledge of Stryker's service line contracts: TMCI states (1) that TMCI "likely knows more about" Stryker's service line contracts "than any other entity" because, TMCI states, it has had "boots on the ground" since the Wright acquisition, and (2) that TMCI has "witnessed first-hand the development and ever increasing usage" of the bundled service line competition.[31]

111. Additionally, Lance A. Berry, a member of TMCI's board of directors since 2022, was the Executive Vice President and Chief Financial and Operations Officer of Wright ***at the time Wright was acquired by Stryker***. As Treace noted in his remarks at the UBS Summit, the Company's strategic vision was developed with input from the "great minds at the board level."

[30] *Id.* ¶ 193.

[31] *Id.* ¶ 243.

112. Moreover, at an internal TMCI conference in Atlanta in late 2023 or early 2024 (attended by Aaron Berutti, TMCI's Senior Vice President, Sales), CW-5 personally delivered a presentation on the fact that TMCI was struggling to compete with these major suppliers and their service line contracts and was becoming "locked out of hospitals due to contracts." According to CW-4, TMCI was losing business to Stryker "mainly because of contracts": "Stryker owns a lot of contracts with hospitals. They would block out some of our stuff." Company management was apparently so concerned by the impact of service line contracts that it established a "contracting team" to "combat" that impact; according to CW-4, the Company "invested a lot of money to combat" the service line contracts.

113. In addition to its lawsuit against Stryker, on May 12, 2025, TMCI filed a separate lawsuit against Zimmer Biomet Holdings, Inc., ("ZBH") and Paragon 28, Inc. ("Paragon", which has been acquired by ZBH; Paragon and ZBH together hereinafter "Zimmer"). In its lawsuit against Zimmer, TMCI makes numerous admissions about the competitive impact that Zimmer's entry to the market for bunion correction had on TMCI's bottom line.

114. In the Zimmer Complaint, TMCI admits that Zimmer introduced a competing product to Lapiplasty in January 2024.[32] Although the Zimmer

[32] Zimmer Complaint ¶ 59.

Complaint does not provide a specific date of introduction, Paragon has stated that as of January 18, 2024, the first cases of the competing product, Bun-Yo-Matic, had been launched.[33]

115. In the Zimmer Complaint, TMCI argues that the Bun-Yo-Matic is a "copycat" of Lapiplasty, and that Zimmer "make[s], use[s], sell[s], and offer[s] for sale in the United States an ***unauthorized copycat*** version of Treace Medical's Lapiplasty System and Procedure."[34] The Zimmer Complaint goes on to assert that TMCI's technology is the basis of the Bun-Yo-Matic system, and that Zimmer is "freeriding off Treace Medical's substantial investments."[35]

116. The Zimmer Complaint admits that TMCI has lost profits as a result of the sale of the Bun-Yo-Matic system,[36] and that surgeons are using the Bun-Yo-Matic system.[37]

---

[33] *See* "First Cases and Limited Market Release of the Bun-Yo-Matic," *available at* https://paragon28.com/first-cases-and-limited-market-release-of-the-bun-yo-matic/.

[34] Zimmer Complaint ¶ 50.

[35] *Id.* ¶ 58.

[36] *Id.* ¶¶ 95, 130, and 165.

[37] *See e.g., id.* ¶ 82.

117. Since a particular bunion surgery need use only one system, every use of the Bun-Yo-Matic system – as with every use of LapiFuse – is equivalent to a lost sale for Lapiplasty.

118. TMCI never informed the market that it was facing increasing levels of competition from these companies. Likewise, TMCI always portrayed Lapiplasty as far superior to any potential alternative, so any attempt by a company such as Zimmer to compete was essentially futile.

119. Taken together, the Stryker Complaint and the Zimmer Complaint reflect a competitive environment that is fundamentally at odds with the one that TMCI and Treace portrayed to the market. These filings demonstrate that TMCI was aware (1) of the impact of competition from multiline manufacturers during the Class Period; (2) that LapiFuse was a peer competitor of Lapiplasty – it was not "generations" behind; and (3) *even if* Lapiplasty *was* far superior to LapiFuse (and it was not), Stryker's ability to bundle its bunion-related products in service line contracts rendered TMCI unable to compete with Stryker on the merits. Contrary to the idea that competition was little or no issue for TMCI, in fact, at least two competitors were actively taking market share from Lapiplasty based on "knockoff" products – so much so that TMCI has sued these competitors asserting violations of its IP – and would continue to do so into the future.

### E. <u>To Maintain the Narrative of "Seasonality" – And Thus the Illusion of Growth – Defendants Pressure the Company's Sales Force to Sell as Many Lapiplasty Kits as Possible in the Fourth Quarter of 2023 and First Quarter of 2024</u>

120. Having badly missed analyst estimates in the third quarter of 2023, Defendants knew that, in order to maintain the Company's growth story – which was temporarily being held together by the narrative of "seasonality" and "prioritized travel" – TMCI needed to have a strong fourth quarter.

121. To ensure this outcome, Defendants engaged in an undisclosed scheme to artificially boost TMCI's fourth quarter revenue by pressuring the Company's sales force to sell as many Lapiplasty kits as possible in the fourth quarter of 2023. Specifically, TMCI instituted a sales incentive program to sell "advanced purchase orders," or "APOs," whereby TMCI's sales force was instructed to sell Lapiplasty kits in bulk (packs of 5, 10, 15, 20, etc.) at a discounted rate. In short, instead of selling Lapiplasty kits to healthcare providers on an as-needed basis (which need would not have arisen until the future), TMCI engaged in a Company-wide push to sell as many Lapiplasty kits as it could in the fourth quarter of 2023 for the express purpose of booking that revenue in that quarter and thereby meeting the expectations of Wall Street analysts. This APO program continued into the first quarter of 2024.

122. The details concerning TMCI's APO scheme were supplied by a number of former Treace Medical employees.

123. According to numerous of these CWs, the purpose of pushing APOs was to meet the Company's financial projections. CW-3 noted that sales representatives were encouraged to "push APOs" to "inflate" numbers for the fourth quarter and "meet a certain metric to round out the year." As CW-5 recounted, TMCI's Senior Vice President, Sales – Aaron Berutti – told the Company's sales force that the program was put in place because "we have a number to hit"; in other words, having led investors to expect certain revenue targets, the APOs were designed to fill the gap by which TMCI was "behind by." "There was just a lot of pressure to try to hit the national number in Q4," recounted CW-3, who explained that this pressure came "from the top" of the Company. Similarly, CW-10 explained that the APO program was pushed aggressively in the fourth quarter of 2023 and the first quarter of 2024, and was designed to help the Company "hit our number"; specifically, CW-10 stated that the "bulk" APO sales "were a push to close the gap" with the "forecast of what they were saying to Wall Street." According to CW-4, at the end of 2023, APO sales became a "pretty big initiative" within the Company: "It was certainly put out to try to push the APOs."

124. CW-12 described the APO initiative in the following terms: when the Company went public in 2021, "everything was going great"; by 2023, however, "pressure was mounting" – likely on account of additional competition from SSPs, described above. "Now that the institutions own you

and the investors and having to be on quarterly calls to Wall Street, that's where the pressure comes." Thus, as the pressure continued to mount in late 2023 following poor results in the third quarter of that year, the Company ramped up the APO intitiative: "A lot of this was driven by, 'We're coming up to the end of the quarter and trends show there will be a gap. We're going to run an APO. Sales managers, get your teams ready,'" CW-12 explained.

125. CW-10 also recounted an email dated December 14, 2023 from his supervisor, a District Sales Manager. The email requested that CW-10 and other sales representatives complete at least one APO before the end of the calendar year in order to "close the quota gap from the previous month." According to CW-10, the e-mail stated: "Everyone needs to work on submitting one APO."

126. The Company's high-level executives drove the push to sell APOs in the fourth quarter of 2023. CW-12 expressly stated that the Company's use of APOs to make up for lagging sales came from the top levels of the Company, including CEO Treace and CFO Hair. CW-3 agreed that the "pressure" came "from the top," and explained that a Regional Vice President of Sales at the Company told him that TMCI VPs had to be on calls "once a week or once a day, something outlandish, with John Treace" and Berutti "to try to push every rep to sell one of these APO kit bundles." According to CW-5, the APO program was discussed on calls with a TMCI Regional Vice President of Sales

"on an almost daily basis." CW-5 described CEO Treace and Berutti as "bullheaded," noting that their attitude was: "We've got to show the market."

127. As is typical in bulk purchasing transactions, TMCI incentivized healthcare providers to purchase APOs by offering a substantial discount.

128. The terms of each APO and the associated discount offered to the specific healthcare provider were negotiated with knowledge and approval by the Company's senior leadership. According to CW-7, the amount of this discount was typically between five and ten percent per kit; larger discounts had to be approved by Berutti. CW-10 similarly explained that larger discounts had to be approved by "upper leadership" or an "executive team" that included Berutti: "If there was anything that needed additional discounts, it would have to go up to the executive committee in order for them to say 'yes' or be more aggressive." CW-8 estimated that some APO transactions resulted in discounts that "probably ended up at almost 50%."

129. To be sure, TMCI had employed sales of APOs in the past; but, as CW-7 stated, in the fourth quarter of 2023, the pressure was "ramped up," and the message from the Company was that "we were running behind on hitting numbers, and [APOs] would help catapult that situation." CW-8 told of a similar dynamic, noting that there was a "significant amount of pressure" within the Company to sell APOs. Likewise, CW-11 described the APO

program as a likely "attempt to try to boost sales," which "almost always" came near the end of the quarter.

130. Moreover, according to CW-5, TMCI even went as far as to deliberately wait as long as possible to ship Lapiplasty kits that had been purchased through APO sales to determine if it would be more beneficial for the Company to book the revenue in the fourth quarter of 2023 or the first quarter of 2024. That is, TMCI told certain hospitals that it would not ship the product "until the last week of December," which gave the Company the ability to "wait and see" if it needed the sales to count for the fourth quarter of 2023 or the first quarter of 2024.

### F. Having Aggressively Sold APOs in the Fourth Quarter of 2023, Defendants Report Positive Results and Triple Down on Dismissing Competitive Threats

131. The APO initiative achieved its desired result. On February 27, 2024, TMCI released its earnings for the fourth quarter of 2023 in a Form 8-K filed with the SEC (the "February 2024 8-K"), where the Company announced that it was able to beat analyst estimates (which had been reduced significantly after the third quarter miss) in the fourth quarter of 2023.

132. As set forth above, TMCI provided 2023 guidance to investors on three separate occasions: *first*, in March 2023, when TMCI guided investors to expect 2023 revenue of $187 million to $193 million; *second*, in August 2023, when TMCI raised its 2023 guidance to revenue between $191 million to $197

million; and, finally, in November 2023, when TMCI cut its 2023 revenue guidance to between $182 million to $186 million.

133. The chart below sets forth TMCI's reported revenue in 2023:

| Reporting Period | Reported Revenue (in thousands) | % Change Over the Same Period in the Previous Fiscal Year |
|---|---|---|
| **Q1 2023** | 42,195 | 45.3 |
| **Q2 2023** | 41,953 | 40.0 |
| **Q3 2023** | 40,758 | 23.3 |
| **Q4 2023** | 62,212 | 25.0 |
| **FY 2023** | 187,118 | 31.9 |

134. Having beaten analyst estimates and met the high end of its initial guidance of $187 million for the full year of 2023, TMCI also raised analyst expectations by setting 2024 guidance for revenue as $220-225M, an 18-20% increase over 2023. While this was still lower than the 50% growth of the early years, it was still significant growth and suggested a world in which Lapiplasty would continue to take market share from Legacy Procedures and effectively compete against potential SSPs. In short, the Company stated that it had a roadmap to profitability: "The Company expects to make significant progress towards Adjusted EBITDA breakeven for full-year 2024 and anticipates Adjusted EBITDA to improve approximately 50% compared to full-year 2023."

135. But the purported "growth" reported in the fourth quarter of 2023 was artificial, as numerous CWs have confirmed. According to CW-5, TMCI's fourth quarter results would have been a disaster in the absence of the APO push. "That's why they did it," recounted CW-5, who added that it was a "straight P&L" play to boost fourth quarter revenue.

136. Given the narrow margin by which TMCI was able to "beat" its prior guidance, the reasonable inference is that the Company's ability to meet expectations would not have been possible absent its aggressive push to sell APOs in the fourth quarter of 2023. According to CW-7, CW-8, CW-10, and CW-12, the amount of the Company's revenue in the fourth quarter of 2023 attributable to sales of APOs was greater than five percent, with CW-12 stating that it was "definitely significant" and that it was "definitely" reasonable to believe that the actual amount of revenue attributable to APOs was between twenty-five and forty percent.

137. Equipped with these artificially inflated fourth quarter results, Defendants were able to triple down on dismissing competitive pressure – for the time being. For example, on January 9, 2024, the Individual Defendants attended the J.P. Morgan Healthcare Conference, where Treace emphasized the benefits of the Company's "highly focused product line that allows us to scale our business in a very capital-efficient manner." Unlike "traditional orthopedic extremity companies [which] may offer 5,000, 10,000 or more

sellable products," Treace continued, "we support our business with just 40 today, and this focus allows us to rapidly innovate our lead products to drive deeper market penetration and defend our market leadership positions."

138. Likewise, Treace was also asked directly about the potential benefits of having a more expansive portfolio of products; specifically, a J.P. Morgan analyst asked Treace whether having additional products presented "bundling opportunities" in negotiations with healthcare providers and whether "having a bigger bag to go sell to the hospital systems" was competitively beneficial. According to Treace: "You know, ***we haven't had a tremendous problem even back when we only had Lapiplasty because it was so differentiated***." Thus, Treace presented a state of affairs in which the fact that TMCI only operated in one market was no barrier at all to moving its products into healthcare systems when, in fact, the opposite was true – Stryker was utilizing its service line contracts to effectively bar TMCI from a sizeable portion of relevant healthcare networks.

139. Yet, in addition to repeating the same misleading statements about the competitive benefits of the Company's singular focus, the slide deck accompanying TMCI's presentation at the J.P. Morgan Healthcare Conference boasted that the Company had a "[c]lear line-of-sight to near-term profitability – driving towards adj. EBITDA breakeven for FY 2024 and cash flow positive in 2025," and that its revenue growth was "driven by increasing

surgeon utilization, new surgeon users and higher blended average sales price (BASP)."

140. Concurrently with the release of the February 2024 8-K, the Company also filed its Form 10-K for the 2023 fiscal year (the "2023 10-K"). In the 2023 10-K, TMCI made various risk disclosures to investors. Specifically, TMCI stated: "We operate in a very competitive business environment, and ***if*** we are unable to compete successfully against our existing or potential competitors, our business, financial condition and results of operations ***may*** be adversely affected." In addition, and despite the fact that the Company was *already experiencing* increased competition from companies like Stryker, TMCI explained that:

> These competitors and other potential market entrants ***may*** develop ***new*** products, procedures or treatment alternatives that ***could*** render our products obsolete or ***uncompetitive***. In addition, one or more of such competitors ***may*** gain a market advantage by developing and patenting competitive products, procedures or treatment alternatives earlier than we can, obtaining regulatory clearances or approvals more rapidly than we can or selling competitive products at prices lower than ours.

141. That same day, TMCI held it earnings call for the fourth quarter and full year of 2023 (the "Q4 2023 Earnings Call"). On the call, Treace was asked point blank by an analyst from Stifel about whether TMCI was feeling any competitive pressure from companies "imitating your strategy," which the analyst suspected was happening based on his attendance at various other

industry conferences. Treace flatly denied the suggestion, and reverted back to his well-rehearsed, two-prong strategy:

> We've been seeing progressively more people enter the space over the past three years and ***new competitors entering the space is kind of nothing new to us***, it's a really exciting market that we've sort of strategically redirected, in terms of three plane bunion correction. So, no surprise that other companies want to enter that space, the space that we pioneered and developed. . . . So, the bunion space itself still very under-penetrated. ***We're way out ahead***, our retention rates with our surgeons are very high. ***Our IP makes it difficult for these copycats and tends to produce less elegant solutions that work more like the old freehand Lapidus [i.e., a Legacy Procedure] then they do Lapiplasty***. And we just strongly believe that nothing works as well at this surgeon patient interface as Lapiplasty does. And then you have to keep in mind ***these new entrants are entering the market, using multi-line largely distracted sales forces. So, they only get really a fraction of that sales forces time and attention*** and we think our three-pronged offense of direct focused sales channel, rapid product innovation and iteration and surgeon and patient education. While these are great offensive tools, they position us with a very strong defense as well. And we're just going to keep reinforcing that over time and continuing to grow and establish ourselves as the fastest growing company in the foot and ankle market which is what we are today and where we're going to continue to be.

142. Thus, as late as February 27, 2024, Treace continued to present the competitive dynamic as "nothing new." The market was thus led to believe that TMCI's roadmap to profitability would not be hindered by the competition because the competition was "distracted"; as a result, TMCI's sole-focus business model was a competitive advantage. Taken together with Treace's earlier comments, investors were led to believe that TMCI's poor earnings in the summer of 2023 were the result of transient factors – summer travel – and

nothing structural that might affect TMCI going forward. In light of artificially inflated fourth quarter sales, the previous explanation of "seasonality" became more credible.

143. Eventually, however, the music had to stop. As several CWs confirmed, the practice of selling bulk APO orders was simply a way of pulling revenue into the present that would otherwise have been booked at some unknown time in the future. According to CW-7, it was simply "rob[bing] from the future to pay the present," and even though the APO sales had the effect of "bumping up" sales numbers for the fourth quarter of 2023, it put the Company's sales representatives "further behind the eight ball" in each subsequent quarter. CW-9 agreed: the sale of APOs in one quarter "would benefit in the short term," but "it had the propensity to screw you in the long term."

144. According to CW-7, this eventuality was understood by the Company's senior management. Specifically, CW-7 recounted a conversation with a Regional Vice President of Sales for the Company, who was "very vocal" with TMCI's Senior Vice President of Sales, Aaron Berutti, about the possibility that future sales numbers would suffer after pushing APOs so aggressively. According to CW-7, Berutti's response was to simply "find more accounts" to "do more APOs."

145. CW-7 recounted conversations with other Company sales representatives, who would say that they "can't sell anything more because I'm still working off the kits" sold through APOs in the previous quarter. According to CW-8, one of his colleagues sold a "huge APO" to a hospital network in Fort Wayne, Indiana at the end of 2023 but was not able to sell *any* more product to that network until July 2024. According to CW-8, the APO program – which CW-8 referred to as "the death" – was Berutti's attempt to "cover his ass" by boosting sales at the end of the year and "dealing with the repercussions later."

146. CW-10 echoed the general sentiment: "You are borrowing from the future for today, and then you have to find another way to grow the business." CW-11 similarly stated that because "[a]ll you're doing is borrowing money," it was "more difficult to gain revenue" in quarters after a sales representative had sold APOs.

147. There were simply fewer sales left to make. As CW-7 summarized, TMCI was "mortgaging the future."

### G. The Truth Emerges as Treace Admits "Competitive Pressure" Was "Creating a Headwind" for TMCI

148. On May 7, 2024, after market hours, TMCI reported its first quarter results in a Form 8-K filed with the SEC. While the results appeared decent at first glance, the market was shocked as the Company announced it

was cutting 2024 revenue guidance from $220 to $225 million down to $201 to $211 million (despite having only released first quarter results, and despite having provided the $220 to $225 million guidance range little more than two months prior).

149. Even more shocking, the Company's stated rationale for the guidance cut was "more competition from knockoffs of our Lapiplasty products" – i.e., SSPs. Despite having led the market to believe – for years – that Lapiplasty's competitors were "generations" behind, now, suddenly, knockoffs were causing guidance reductions. On the Company's earnings call for the first quarter of 2024, Treace admitted that TMCI was beginning to feel "competitive pressure" from knockoffs, which was "creating a headwind."

150. The abrupt guidance cut to $201 to $211 million compared unfavorably to 2023 revenue of $187.1 million. Instead of the 18%-20% revenue growth investors were led to expect, TMCI was now guiding to a greatly reduced 7%-12% growth. This disclosure cut the growth story in half – not only was growth slowing, it was almost stopping entirely. According to Treace, the Company would be "taking decisive action to mitigate the impact of these competitive headwinds by rightsizing our P&L and reducing costs."

151. Yet, equally shocking to investors was the Company's plan to combat this newly disclosed impact of competition: despite years of telling investors that TMCI's sole focus was a competitive advantage, Treace

indicated that TMCI would be reducing that focus and seeking to become a more diversified company. This further indicated to investors that Lapiplasty lacked the "unmatched" competitive edge that Treace had trumpeted for years.

152. Investors' shock translated into a severe market reaction. TMCI stock fell ***62.5%*** in a single day as investors digested the competition-caused guidance cut, the new information regarding "competitive pressure" from knockoffs, and the strategy change that suggested that the Company's singular focus was not a competitive advantage after all, or at least not an unmitigated one.

153. By May 8, 2024, investors had repriced TMCI stock in light of this new information and the materialization of previously concealed risks. Previously hidden from them, investors now knew that competition from SSPs was very much *already* impacting TMCI, that TMCI was not "so far ahead" of the competition, and that the Company's singular focus was not a pure advantage.

154. When asked whether the timing of TMCI's May 7, 2024 guidance cut was the result of how aggressively it had pushed APOs in the fourth quarter of 2023, CW-7 stated: "That's what we deduced in the field." "It was kind of easy to figure out," especially for "customer-facing" employees like sales representatives who "knew what was causing issues," noted CW-7. CW-

8 agreed: "I think the overinflated number off of the end of [2023] because of the APO purchases definitely played into in effect why they had to reduce their earnings to Wall Street." "[I]f anybody had a brain, you could figure that out pretty quickly," noted CW-8. CW-10 agreed: the aggressive use of APOs "certainly did contribute" to the guidance cut.

155. Given the correlation between the Company's aggressive sale of APOs in the fourth quarter of 2023 and the first quarter of 2024 – as well as what CW-5 described as TMCI's apparent practice of strategically deciding whether revenue from a particular APO would be counted in the fourth quarter of 2023 or the first quarter of 2024 – it is unsurprising that the Company's results in the second quarter of 2024 were as poor as they were:

| **Reporting Period** | **Reported Revenue (in thousands)** | **% Change Over the Same Period in the Previous Fiscal Year** |
|---|---|---|
| **Q1 2023** | 42,195 | 45.3 |
| **Q2 2023** | 41,953 | 40.0 |
| **Q3 2023** | 40,758 | 23.3 |
| **Q4 2023** | 62,212 | 25.0 |
| **Q1 2024** | 51,108 | 21.1 |
| **Q2 2024** | 44,455 | 6.0 |

156. Said another way, having used the APO initiative in the fourth quarter of 2023 and the first quarter of 2024 to sell as many Lapiplasty kits

as possible, by the second quarter of 2024, there were no healthcare providers left in need of further Lapiplasty kits: they had made all necessary purchases in previous quarters, leading TMCI to experience its slowest quarter of year-over-year revenue growth as a public company.

**MATERIALLY FALSE AND MISLEADING STATEMENTS**

157. Defendants' materially false and misleading statements during the Class Period fall into four categories. ***First***, TMCI and Treace misrepresented the superiority of TMCI's flagship product, Lapiplasty, vis-à-vis other bunion correction products, the sustainability of the Company's narrowly focused business model, and the nature and extent of the competition that Lapiplasty was facing in the market for bunion correction, as well as how the Company's business model hindered – instead of promoted – the Company's ability to compete in that market over the long run. ***Second***, Defendants concealed the extent to which increasing competition contributed to TMCI's poor results in the third quarter of 2023 by stating that such results were merely the result of heightened patient travel, i.e., seasonality. ***Third***, Defendants misrepresented the quality and sustainability of the Company's revenues in the fourth quarter of 2023 (and thus, the full year of 2023). ***Fourth***, Defendants falsely certified the strength and adequacy of TMCI's internal disclosure controls, as they were required to do under the Sarbanes-Oxley Act of 2002 ("SOX"), despite clear weaknesses in those controls,

evidenced by the numerous false and misleading statements Defendants made regarding the nature and extent of competition that TMCI was experiencing throughout the Class Period and the quality and sustainability of the Company's revenues in 2023.

### A. False and Misleading Statements Regarding Lapiplasty, TMCI's Business Model, and the Competitive Dynamics of the Market for Bunion Correction

158. Throughout the Class Period, TMCI and Treace repeatedly misrepresented the superiority of TMCI's flagship product, Lapiplasty, vis-à-vis other bunion correction products, the sustainability of the Company's narrowly focused business model, and the nature and extent of the competition that Lapiplasty was facing and would continue to face in the market for bunion correction, as well as how the Company's business model hindered – instead of promoted – the Company's ability to compete in that market.

159. On May 8, 2023, TMCI held an earnings call with analysts to discuss its results for the first quarter of 2023. On that Q1 2023 Earnings Call, Treace made numerous statements about the efficacy of Lapiplasty vis-à-vis other methods of bunion correction, and assured investors that Lapiplasty was not at risk of losing market share to other products – precisely because of that efficacy. In addition, Treace emphasized that the Company's narrowly focused business model gave it a competitive advantage over other

medical device manufacturers who marketed products across a wide range of unrelated products lines.

160. Specifically, and in response to a direct question about competition from an analyst,[38] Treace stated:

> There are other products in the marketplace being offered from other companies. ***Most of these are kind of highly diversified companies with large bags of products. We're not really seeing any incremental, I think, opposition to our momentum coming from these.*** In some ways, they're just further validating what we started and what we developed long ago. ***Any of these companies' products and offerings get like a fractional portion of their sales team's time and attention***. And what we found is with over nearly eight years of refinement, Lapiplasty is just so elegant and reproducible, ***it's frankly just unmatched in performance at the doctor patient interface. And we continue to wrap more patents around what we're doing, making it a little more challenging for companies to make something that can truly replicate the elegance of Lapiplasty.*** So, on top of that, our direct sales channel, our training programs, our patient advocacy through our [direct-to-consumer program] are real clinical outcomes data that we can back up our product with. It just further differentiates us in the market, but ***I can't say that there is any one of these multi-line distracted companies that's slowing our business momentum***.

161. The bolded statements above were materially false and/or misleading and failed to state material facts. ***First***, it was materially false and misleading to state, in May 2023, that TMCI was not seeing any

[38] Specifically, a J.P. Morgan analyst asked: "As maybe as a follow-up here. There is a lot that we're hearing in terms competitively out in the field and other lower extremity bunions competitor was recently acquired and the noise is growing, which is great for the field and the conversion to instrumented procedures but I'd love to hear what the reps are seeing out in the field? Do you think any of the competitors are impeding your ability to grow and if you don't win an account, what's the number one reason you're not here?"

"incremental . . . opposition to [the Company's] momentum from" "highly diversified companies" when, in fact, Stryker's LapiFuse was already beginning to take market share from Lapiplasty in early 2023, if not before, and was likely to continue doing so into the future; according to CW-5, it was "100%" true that TMCI was beginning to see competition from "knockoff" products – including from Stryker's LapiFuse and other SSPs – in 2023, if not earlier; more specifically: "There was already serious, legitimate competition in 2022 – the same as 2023." ***Second***, it was materially misleading to state that "highly diversified companies with large bags of products" (products that were only given a "fractional portion of their sales team's time and attention") would struggle to compete with Lapiplasty on account of this fact alone; indeed, TMCI has admitted having access to information suggesting that the Company was losing (and would continue to lose) market share to Stryker precisely because Stryker was able to bundle its bunion-related products in its service line contracts. ***Third***, it was materially false and misleading to state that Lapiplasty was "unmatched" in performance when – as TMCI has already admitted in the Stryker Complaint – SSPs to Lapiplasty ("copycat" products) both existed and were actively competing with Lapiplasty. Likewise, several confidential witnesses have reported discussions with medical professionals who, in the words of CW-6, "just didn't see" how Lapiplasty "was better at all"; given the flow of information at the Company,

Defendants had access to this information, or recklessly disregarded it. ***Fourth***, the statement that TMCI was continuing to "wrap more patents around" its products, thereby "making it a little more challenging for companies" to replicate Lapiplasty, was materially misleading when, as TMCI has already admitted, Stryker had already developed a "copycat" product that was actively competing with Lapiplasty.

162. TMCI and Treace made similarly false and misleading statements throughout the remainder of the Class Period, as set forth below.

163. On May 10, 2023, Treace presented at the BAML Conference. In response to a direct question about competition,[39] Treace stated:

> ***Broadly or in general, the competitive landscape, the way we look at the competition is our biggest competitor is changing the mindset of doctors*** applying the [Legacy] osteotomy procedure to 70% or more of their cases. So we're more focused on changing the doctor's perspective on what procedure or what technique to use versus what competitors should we try to displace or what competitors trying to get at our business. That said, there are companies out there with products that are – they're saying are like Lapiplasty. . . . We're not discounting [competitors'] products, but ***they're highly diversified companies. The reps have big bags of products and this is just another in the bag and it's going to get a fraction of their time. [TMCI] is a company with over 400 people that only do this all day long. We're way out ahead and we innovate and iterate so rapidly on our product that it's***

[39] Specifically, a Bank of America analyst asked: "So we have a few minutes left. Maybe we could just talk about the competitive environment. Obviously a number of players in the space. John [Treace], you talked about the importance of clinical data that you guys have. It's funny because it's not usually a topic of conversation in orthopedic markets. So it is a little bit unique. So I guess maybe talk a little bit about how that resonates with foot and ankle docs and how that does give you a competitive edge if it does, like, how you see that?"

> ***hard not to be shooting behind if you're a competitor, because we'll already be two or three generations ahead when [competitors] get to market. So it's hard to compete with a highly focused company that's so far ahead and moving that fast if you're a big diversified player.***

164. The bolded statements above were materially false and/or misleading and failed to state material facts. ***First***, it was materially misleading to state that TMCI's "biggest competitor" was simply the "mindset of doctors" – i.e., surgeon ignorance – when, in fact, the Company was already experiencing significant competition from Stryker's LapiFuse and other SSPs. ***Second***, it was materially misleading to state that "highly diversified companies" that sold numerous, varied products (products that were only given a "fraction of their [sales reps'] time") would struggle to compete with Lapiplasty on account of this fact alone. ***Third***, it was materially false to state that TMCI was "way out ahead" of potential competitors when, in fact, TMCI was already experiencing significant loss of market share from "copycat" products. ***Fourth***, it was materially misleading to state that TMCI's status as a "highly focused company" gave it a leg up on the competition when, in fact, TMCI was being actively shut out of certain healthcare networks specifically on account of its limited product portfolio. By implying that TMCI's "focus" was a competitive advantage, Treace misled investors by failing to disclose that this "focus" left the Company vulnerable to competitors such as Stryker who could "bundle" their bunion correction products in service

line contracts at the exclusion of TMCI and Lapiplasty. ***Fifth***, the statement that TMCI would be "two or three generations ahead when [competitors] get to market" was misleading in that "copycat" Lapiplasty products – such as those produced by Stryker – were already in the market and actively competing against Lapiplasty. These SSPs were not, in the eyes of relevant users (surgeons), two to three generations behind as such users were already replacing Lapiplasty with these cheaper alternatives.

165. Taken together, Treace's statements at the BAML Conference gave the market the misleading impression that if TMCI was simply able to effectively market Lapiplasty within the medical community, there were no meaningful barriers to widespread acceptance of Lapiplasty: if a surgeon chose to upgrade from a Legacy Procedure, Lapiplasty's superior quality made it an obvious choice over competitor products that would always be "generations" behind.

166. On August 16, 2023, the Individual Defendants attended and spoke to analysts and investors at the UBS Summit. In response to a direct question from a UBS analyst about competition,[40] Treace assured investors that it had not seen any change in the competitive dynamic, and that

[40] Specifically, a UBS analyst asked: "Well, we'd be remiss if we didn't address the competitive landscape. So there has been some activity over the last few years on the competitive front. How has the landscape evolved? Some of these larger ortho-focused players have made acquisitions here. What are you seeing, broadly speaking, from a competitive perspective?"

Lapiplasty's superior design ensured that the Company's competitive position would remain strong into the future, stating, in relevant part:

> Obviously, we've created a lot of excitement in the space. And as we built the company and developed the company, there are a lot of great minds at the board level that have been helping us strategically. And we built this company very intentionally knowing that if we're successful, ***people are going to – want to try to come in and capitalize on the market that we pioneered and we've developed***. So we've had several competitors, core competitors out there in the marketplace for the last several years, one introduced in early 2020 from a major player. I don't think that product has changed in form or design to this day. In the same time, Treace Medical has changed its instrumentation and its implants three times. . . . ***So I think it's really hard for these multi-line*** – and these are excellent companies. We have tremendous respect for them, by the way. ***But just the reality of all the product lines they're carrying and the salespeople that have to go in with a very large bag of items and try to target this one procedure that we are absolute experts in. And we haven't seen a technology that can match Lapiplasty at the surgeon-patient interface yet.*** With eight years of just rapid iteration and improvement, Lapiplasty is so refined. ***There's just nothing yet that performs like it at the end user interface. And you combine that with all the expertise we have, all the support we put around these doctors with education and informing patients and our direct channel and the clinical data. It's hard for these larger multi-line companies to keep up with a rapidly innovating, focused company like Treace Medical.***
>
> . . .
>
> Because there's only one Lapiplasty by definition, it's a patented method. It's a registered trademark of Treace Medical. ***There is no substitute.***

167. The bolded statements above were materially false and/or misleading and failed to state material facts. ***First***, the statement that it was "hard" for multiline product manufacturers to target the one procedure that

TMCI was "expert" in was misleading because it omitted that such a manufacturer could – and indeed already was – bundling products in service line contracts in a way TMCI could not, given TMCI's narrow focus and limited portfolio. In particular, TMCI has admitted that Stryker successfully bundled products in a way that TMCI could not, and that this limitation had been negatively affecting TMCI's growth. This statement was particularly misleading given the context insofar as Treace directly invoked a "competitor" who introduced a design in early 2020 – meaning Stryker (after its acquisition of Wright) – only to imply that this competitor was not having success against Lapiplasty when, in fact, it was, as several confidential witnesses have confirmed. ***Second***, the statement that Treace had not "seen a technology that can match Lapiplasty" was materially false and/or misleading given his awareness at this point in time that Stryker was actively marketing a "copycat" product that matched (even if it did not exceed) Lapiplasty's capabilities. ***Third***, the statements that there was "just nothing yet that performs like [Lapiplasty] at the end-user interface" and that there was "no substitute" for Lapiplasty were materially false and misleading given TMCI's awareness of SSPs by this point in time that were comparable to Lapiplasty's technology and thus performed "like" (even if they did not exceed) Lapiplasty. ***Fourth***, the statement that Treace knew competitors were "going to . . . try to come in and capitalize on the market that we pioneered" was misleading in

that it falsely implied that competitors were not already capitalizing on TMCI's market by offering SSPs; when considered in light of previous statements about competition – in particular, that TMCI was "way out ahead" of the competition and that Lapiplasty was "unmatched" – this statement also misleadingly implied to investors that SSPs were not already entering the market and actively taking market share from Lapiplasty. ***Fifth***, the statement that it would be "hard" for multiline product manufacturers to "keep up with a rapidly innovating, focused company like Treace Medical" was misleading because it omitted that multiline producers could – and indeed already were – bundling products in a way TMCI could not specifically on account of that narrow focus. In particular, TMCI has admitted that multiline producer Stryker has successfully bundled products in a way that a focused company like TMCI could not, and that this had been negatively affecting and would continue to negatively affect TMCI's growth.[41]

168. Months later, on January 9, 2024, the Individual Defendants attended and spoke to analysts and investors at the J.P. Morgan Healthcare Conference. In his prepared remarks, Treace emphasized the benefits of the Company's "***highly focused product line that allows us to scale our business in a very capital-efficient manner***"; Treace continued:

[41] Stryker Complaint ¶ 201.

> This is a very unique model in orthopedics. ***While traditional orthopedic extremity companies may offer 5,000, 10,000 or more sellable products, we support our business with just 40 today, and this focus allows us to rapidly innovate our lead products to drive deeper market penetration and defend our market leadership positions.***

169. Later in his presentation at the J.P. Morgan Healthcare Conference, Treace was asked point blank about the benefits of "bundling" and the possibility that having a larger product line might be competitively beneficial inasmuch as it might give the Company a greater ability to penetrate healthcare systems.[42] Treace responded: "You know, ***we haven't had a tremendous problem even back when we only had Lapiplasty because it was so differentiated***."

170. The bolded statements above were materially false and/or misleading and failed to state material facts. ***First***, the statement that TMCI's narrow focus on the bunion correction market gave the Company a unique competitive advantage over larger companies, such as Stryker, that "may offer 5,000, 10,000 or more sellable products" was misleading because it omitted that such manufacturers could – and indeed already were – bundling products in a way TMCI could not, specifically on account of TMCI's narrow

[42] Specifically, Treace was asked by a J.P. Morgan analyst: "I would imagine there's also bundling opportunities when you go into healthcare systems, where they say you have one product. We don't really want to stock you on the shelf. [TMCI now has] 40 SKUs. That's more meaningful, we can work with you. ***How important is having a bigger bag to go sell to the hospital systems to be able to get on the shelf***?"

focus and limited portfolio. ***Second***, the statement that TMCI did not have a "tremendous problem" marketing Lapiplasty "because it was so differentiated" – i.e., because it was superior in quality to any potential competitor – presented a misleading state of affairs in which the market for bunion correct procedures operated on merit alone – and not, as it in fact did, on the ability of a manufacturer such as Stryker to bundle bunion correct products with other, non-bunion related products. ***Third***, it was false to state that TMCI did not have a "tremendous problem" in the past when, in fact, Stryker was successfully bundling products in a way that TMCI could not, and that Stryker was effectively limiting the total market share available to TMCI on this very basis.

171. On February 27, 2024, TMCI filed its Form 10-K for the 2023 fiscal year. In the 2023 10-K, signed by the Individual Defendants, TMCI made risk disclosures to investors. Specifically, TMCI stated: "We operate in a very competitive business environment, and ***if we are unable to compete successfully*** against our existing or potential competitors, our business, financial condition and results of operations ***may be adversely affected***." Additionally, TMCI provided a list of its potential competitors, but explained that:

> These competitors and other potential market entrants ***may*** develop ***new*** products, procedures or treatment alternatives that ***could*** render our products obsolete or ***uncompetitive***. In

> addition, one or more of such competitors ***may*** gain a market advantage by developing and patenting competitive products, procedures or treatment alternatives earlier than we can, obtaining regulatory clearances or approvals more rapidly than we can or selling competitive products at prices lower than ours.

172. The statements above were false and/or misleading and failed to state material facts insofar as they falsely implied that these competitive risks were hypothetical future risks, when in fact the risk of competition from SSPs was already occurring in February 2024. By describing what competitors "may" do, as opposed to disclosing what competitors were doing, TMCI misled investors by falsely implying that these risks had not yet occurred when, in fact, SSPs had already entered the market and were actively taking market share from Lapiplasty.

173. Finally, on February 27, 2024, TMCI held its Q4 2023 Earnings Call, where Treace was once again directly asked about whether TMCI was feeling any competitive pressure from companies "imitating your strategy." Treace flatly denied the suggestion, and instead implied that the status quo was holding:

> We've been seeing progressively more people enter the space over the past three years and ***new competitors entering the space is kind of nothing new to us*** . . . . So, no surprise that other companies want to enter that space, the space that we pioneered and developed. . . . ***We're way out ahead***, our retention rates with our surgeons are very high. ***Our IP makes it difficult for these copycats*** . . . . And we just strongly believe that nothing works as well at this surgeon patient interface as Lapiplasty does. And then you have to keep in mind ***these new entrants are entering the market, using multi-line largely distracted***

> ***sales forces. So, they only get really a fraction of that sales forces time and attention*** . . . .

174. The bolded statements above were false and/or misleading and failed to state material facts. ***First***, it was misleading to state that additional competition was "nothing new" because it falsely implied that any potentially new competition would be just as unsuccessful in competing against Lapiplasty as all previous potential competitors had been. ***Second***, it was misleading to state that TMCI's "IP makes it difficult" to truly compete with Lapiplasty because it falsely implied that SSPs had not already entered the market and were not actively taking market share from Lapiplasty when, in fact, both Stryker and Zimmer had introduced SSPs that were directly competing with Lapiplasty. ***Third***, it was materially misleading to state that larger companies with "distracted sales forces" would be unable to compete with TMCI because it omitted that such manufacturers could – and indeed already were – bundle products in a way TMCI could not, specifically on account of TMCI's narrow focus and limited portfolio.

## B. False and Misleading Seasonality Statements

175. Following its IPO in 2021, TMCI's senior executives often blamed "seasonality" for the Company's generally sluggish sales performance during the summer months of the third quarter.

176. Beginning in 2023, however – and as explained above – the exponential downside effects of Stryker's service line contracts had begun to manifest. Accordingly, in the third quarter of 2023, TMCI reported poor earnings results, and missed consensus Wall Street estimates.

177. Rather than reveal the truth to investors – that increasing competition was behind TMCI's particularly poor third quarter results in relation to previous years – Defendants doubled down and portrayed "seasonality" in the third quarter of 2023 as not only bad, but *uniquely* bad (indeed, much worse than previous years).

178. On the Company's Q3 2023 Earnings Call, Treace began by explaining that TMCI's poor third quarter results were due to "prioritized travel and vacations from our patient demographic that started in the second quarter and continued through most of the third quarter."

179. In addition, the presentation provided to investors in connection with the Q3 2023 Earnings Call stated that: "Revenue results impacted by prioritized travel and vacations for our patient demographic, which led to lower than anticipated demand for our Lapiplasty procedure in the quarter" (emphasis in original).

180. The statements in Paragraphs 178-179 were false and/or misleading and failed to state material facts. Specifically, in saying that prioritized travel and vacations" were to blame for the Company's poor third

quarter results, TMCI and Treace omitted the crucial fact that TMCI was also beginning to experience increased competition from "copycat" products such as LapiFuse and other SSPs in a manner that was structural and not transient. Indeed, according to CW-2, beginning in Q3 2023, CW-2 began to experience declining demand for Lapiplasty on account of cheaper alternatives developed by numerous competitors; further according to CW-2, in the summer of 2023, "it was like somebody turned off a switch" such that CW-2 went from selling Lapiplasty for about 12 cases per month to only three or four per month. Likewise, CW-4 reported seeing sales reports for the Midwest region that showed significantly declining sales, and noted that CW-4's own sales were "down 30-40%" in the second and third quarter of 2023, before rebounding in the fourth quarter.

181. Later in the Q3 2023 Earnings Call, Hair expressed his "surprise[]" at this supposed increase in "summer seasonality," which was "more pronounced than we had expected," and was the reason "why the case volumes were down in Q3 and why the surgeon adds were down in Q2 and Q3 as well."

182. This statement was false and/or misleading and failed to state material facts. ***First***, Hair's statement that "summer seasonality" was to blame for "why the case volumes were down in Q3" omitted the crucial fact that TMCI was also beginning to experience increased competition from "copycat" products such as LapiFuse and other SSPs in a manner that was

structural and not transient. ***Second***, Hair's statement that the decrease in new surgeon users was due to summer seasonality omitted that TMCI's surgeon count was being impacted by an increasing number of surgeons who were choosing to use the lower cost, copycat SSPs in lieu of Lapiplasty, and that such impact was in fact structural and not transient. Indeed, according to CW-2, beginning in Q3 2023, CW-2 began to experience declining demand for Lapiplasty on account of cheaper alternatives developed by numerous competitors; further according to CW-2, in the summer of 2023, "it was like somebody turned off a switch" such that CW-2 went from selling Lapiplasty for about 12 cases per month to only three or four per month. Likewise, CW-4 reported seeing sales reports for the Midwest region that showed significantly declining sales, and noted that CW-4's own sales were "down 30-40%" in the second and third quarter of 2023, before rebounding in the fourth quarter. ***Third***, in stating that the reduction in new surgeon users continued through "most" of the third quarter, Treace implied that the lower surgeon count had abated or stopped, when in reality it had not abated or stopped; in fact, and as detailed above, it was only increasing – and increasing at an exponential rate – due to structural issues within the market for Lapiplasty, i.e., increased competition from larger competitors who could bundle their SSPs in service line contracts.

183. Similarly, on the Q3 2023 Earnings Call, Treace was asked directly about the impact of competition,[43] and stated:

> [W]e've had competition for the last several years in this space. We kind of expected it. We created a very exciting market. The market is very big, over $5 billion in the US. We're way out ahead, and we've got the best technology. New entrants will continue to come into the market, but we've got a pretty powerful offense. Our rapid innovation, our focus, our direct sales channel, and then this patient advocacy that we drive through our DTC. ***So when – will competition be there and continue to be there? Yes, it has been and it will continue to. But that's not what was driving this shift. That's not what's driving the softness in the summer months. This was a real and dramatic shift in the way our patient demographic, the 30- to 60-year-old female in the US behaved this year.*** And the headlines, you can see it all over the place. International travel, my wife was quite upset with me because I think we're the only people we don't know that didn't go to Europe at least once this year. ***And it was bottled up, four years of pre-COVID plans that all came piling into this year once the COVID restrictions left, and that demographic behaved differently probably than other companies' demographics.***

184. The bolded statements above were false and/or misleading and failed to state material facts. ***First***, it was false to state that competition was not even a factor "driving th[e] shift" and causing lower Lapiplasty sales – instead blaming the "softness in the summer months" on "international

[43] Specifically, a Morgan Stanley analyst asked: "Hi, John, and Mark. I – just maybe to start on my end, just what essentially gives you the confidence that this is truly a seasonality aspect? And I appreciate that it might be picking up into the fourth quarter, but why are you so confident that seasonality and not any competitive entry or changes in the landscape being – becoming more of a problem in capturing surgeon mine share any incremental procedures? And I know that we're all trying to get at maybe what utilization could look like into 2024, but maybe just help us better understand what you were seeing in terms of same surgeon utilization levels in the third quarter that's giving you confidence that maybe we're not appreciating."

travel" – when in fact TMCI was beginning to feel the pressure of increased competition from SSPs that were bundled in the service line contracts of larger competitors, such as Stryker's LapiFuse product. ***Second***, and for similar reasons, it was misleading to portray TMCI's decreasing sales as transient – i.e., that the decrease was occurring "this year" and on account of increased travel demand – because it falsely implied that demand would pick back up once the "bottled up" demand for travel that "came piling into this year" ceded. Taken together with Treace's statement above that competition was definitively not what was "driving" the shift, investors were left with the misleading impression that TMCI was experiencing only a temporary shift in patient behavior and a temporary reduction in revenues – not a structural erosion of its competitive position.

185. Several days after the Q3 2023 Earnings Call, Treace attended the Stifel Healthcare Conference, where he made a similar series of false and misleading statements about the nature and cause of TMCI's disappointing third quarter results. Responding to a question about the "threats of competition,"[44] Treace described the possibility of increasing competition as

---

[44] Specifically, a Stifel analyst asked: "But just revisiting the quarter and some of the concerns I got from investors, was there any aspect of third quarter performance that reflected greater threats or competition from new – from current competitors? Anything new in the market just at a high level before we get into some of the specifics that leave you at all incrementally concerned?

"noise": "So, although there's competition out there, we didn't see anything material – materially increasing its impact in Q3 nor do we see it in Q4. What happened in Q3 was ***predominantly this seasonal shift*** in the way patients behave this year. That was ***unique***."

186. This statement was false and/or misleading and failed to state material facts. ***First***, it was false to state that talk of potential competition was merely "noise" when in fact TMCI was beginning to feel the pressure of increased competition from SSPs that were bundled in the service line contracts of larger competitors, such as Stryker's LapiFuse product. ***Second***, it was misleading to portray TMCI's decreasing sales as transient – in fact, due to a "unique" "seasonal shift" – because it omitted that TMCI was facing a structural erosion of its competitive position on account of larger competitors that had the ability to bundle their SSPs in service line contracts when TMCI was unable to do the same.

### C. False and Misleading Statements Regarding the Quality and Sustainability of the Company's Revenues in the Fourth Quarter of 2023

187. As set forth above, beginning in 2023, TMCI began to experience heightened competition from larger competitors such as Stryker. This undisclosed competitive dynamic led to the Company's poor results in the third quarter of 2023, which Defendants blamed on "seasonality" and "prioritized travel" from patients. To provide credibility to this explanation –

and to maintain the Company's growth story – Defendants knew that TMCI needed to show strong financial results in the fourth quarter of 2023. As detailed above, to achieve this end, Defendants engaged in an undisclosed scheme to artificially boost the Company's revenue in the fourth quarter of 2023 by pressuring its sales force to sell bulk APOs of its flagship product, Lapiplasty. The failure to disclose this APO campaign rendered the Company's reported revenue in the fourth quarter of 2023 (and thus, for the full year of 2023) materially false and misleading.

188. For example, on January 8, 2024, TMCI filed a press release on Form 8-K with the SEC (the "January 2024 8-K"), signed by to Defendant Hair, where the Company reported its preliminary, unaudited results for the fourth quarter and full-year 2023. Specifically, TMCI reported: (1) "[p]reliminary revenue of $61.8 million to $62.2 million in the fourth quarter of 2023, an approximate 25% increase at the midpoint over the same period in 2022" and (2) "[p]reliminary revenue of $186.7 million to $187.1 million for the full-year 2023, an approximate increase of 32% at the midpoint compared to the prior year and above the high end of the previously provided revenue guidance range of $182 million to $186 million."

189. In the January 2024 8-K, Treace was quoted as saying: "We delivered another year of significant progress in 2023 and expect to remain on track to drive strong growth and profitably scale our business in the years

ahead[.]" The statement further noted Treace's belief that the Company had "all the elements in place to deliver strong growth and sustained market penetration in 2024 and beyond."

190. On February 27, 2024, TMCI filed the February 2024 8-K, which included the Company's audited financial statements for the fourth quarter and full-year of 2023. The February 2024 8-K, signed by Defendant Hair, included a Press Release reporting: (1) "Revenue of $62.2 million in fourth quarter 2023," which represented an "increase[ of] 25% over the same period in 2022"; (2) "Revenue of $187.1 million for full-year 2023," which represented an "increase[ of] 32% compared to prior year and was above the high end of previously provided revenue guidance range of $182 million to $186 million." The February 2024 8-K attributed the increase in revenue to "an increased number of Lapiplasty procedure kits sold as a result of an expanded surgeon customer base, increased utilization and higher blended average selling prices due to increased adoption of the Company's newer technologies and expanding portfolio of complementary products."

191. On February 27, 2024, TMCI also filed the 2023 10-K, signed by the Individual Defendants, which reported full-year 2023 revenue of $187.1 million, which represented a 31.9 percent increase over the previous fiscal year. The 2023 10-K stated that the increase was "partially driven by a 20% increase in the number of Lapiplasty Procedure kits sold in 2023 compared to

2022 as the result of an expanded surgeon customer base. The increase in the volume of Lapiplasty Procedure kits sold resulted in 50.9% of the revenue growth from 2022 to 2023."

192. The statements in Paragraphs 188-191 were false and/or misleading and failed to state material facts. Specifically, the January 2024 8-K, the February 2024 8-K, and the 2023 10-K failed to disclose that the Company's reported revenue in the fourth quarter of 2023 (and thus the full-year of 2023) was driven by a concealed and unsustainable practice of pressuring the Company's sales representative to sell bulk APOs of Lapiplasty kits to healthcare providers. At no time did Defendants disclose that the revenues generated in the fourth quarter of 2023 were driven in part by a strategy, endorsed by its senior executive leadership, to sell as many Lapiplasty kits as possible in the fourth quarter to meet the expectations of Wall Street analysts, nor that such practice would render the revenue reported in that quarter unsustainable over the long run, as detailed by CW-3, CW-4, CW-5, CW-7, CW-8, CW-9, CW-10, CW-11, and CW-12.

193. On January 9, 2024, the Individual Defendants attended and spoke at the J.P. Morgan Healthcare Conference. The slide deck accompanying the presentation stated that the Company had a "[c]lear line-of-sight to near-term profitability – driving towards adj. EBITDA breakeven for FY 2024 and cash flow positive in 2025," and that its revenue growth was

"driven by increasing surgeon utilization, new surgeon users and higher blended average sales price (BASP)."

194. These statements were false and/or misleading and failed to state material facts. Specifically, the presentation accompanying the Individual Defendants' discussion at the J.P. Morgan Healthcare Conference on January 9, 2024 failed to disclose that the Company's revenue growth in 2023 was driven by a concealed and unsustainable practice of pressuring the Company's sales representative to sell bulk APOs of Lapiplasty kits to healthcare providers. At no time did Defendants disclose that the revenues generated in 2023 were driven in part by a Company-wide push, endorsed by its senior executive leadership in the fourth quarter of that year, to sell as many Lapiplasty kits as possible to meet the expectations of Wall Street analysts, nor that such practice would render the revenue reported for the full year of 2023 unsustainable over the long run, as detailed by CW-3, CW-4, CW-5, CW-7, CW-8, CW-9, CW-10, CW-11, and CW-12.

### D. False and Misleading Internal Disclosure Control Statements

195. Under the regulations and guidance promulgated by the SEC, companies whose stock is publicly traded in the United States – such as Treace Medical – are required to file with the SEC certain disclosure documents containing comprehensive information about their business

operations and financial condition. Investors generally rely on the accuracy and transparency of these disclosures – as well as other public statements made by a company – when determining whether to invest.

196. Public companies like Treace Medical are required to maintain effective disclosure controls and procedures to ensure compliance with their SEC reporting obligations. Members of a company's executive team must be involved in creating and designing these controls and must personally guarantee their effectiveness.

197. In the 2023 10-K, signed by the Individual Defendants, the Individual Defendants falsely certified to investors that they had established effective internal disclosure controls and procedures for TMCI.

198. In the 2023 10-K, TMCI stated:

> Our management, with the participation and supervision of our Chief Executive Officer and our Chief Financial Officer, have evaluated our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Exchange Act) before filing this Annual Report. Based on that evaluation, our Chief Executive Officer and Chief Financial Officer have concluded that, as of December 31, 2023, the end of the period covered by this Annual Report, our disclosure controls and procedures were effective to provide reasonable assurance that information we are required to disclose in reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in SEC rules and forms, and that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.

199. Along with the 2023 10-K, Treace and Hair provided certifications concerning the Company's internal disclosure controls and procedures pursuant to Section 302 of SOX. In his certification accompanying the 2023 10-K, for example, Treace stated:

> 1. I have reviewed this Annual Report on Form 10-K of Treace Medical Concepts, Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;
>
> 4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
>    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
>    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external

purposes in accordance with generally accepted accounting principles;

c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

   a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

   b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

200. Defendant Treace signed substantively identical disclosures in the Company’s Form 10-Qs for the second and third quarters of 2023.

201. Defendant Hair signed substantively identical disclosures in the Company’s Form 10-Qs for the second and third quarters of 2023 and in the 2023 10-K.

202. The statements referenced in Paragraphs 198-201 were false and misleading when made and failed to state material facts. It was materially misleading for the Individual Defendants to represent that TMCI's internal disclosure controls and procedures were effective during the Class Period when that was not the case, and Defendants successfully evaded those controls to perpetrate their fraud.

203. According to CW-3, there existed at TMCI an information sharing hierarchy whereby CW-3 and other sales representatives were in frequent communication with various of their superiors regarding sales trends in a particular geographic area and thus the challenges that the Company's sales representatives were experiencing in the field; these superiors then held weekly (if not more frequent) calls with more senior Company executives, including Aaron Berutti, TMCI's Senior Vice President, Sales, and Treace himself, regarding those sales trends.

204. With respect to the Company's reporting of revenues in the fourth quarter of 2023 (and thus the full year of 2023), the allegations provided by numerous former TMCI employees establish that the Individual Defendants knew or recklessly disregarded that the Company's push to sell as many APOs as possible in that quarter rendered their statements regarding the quality and sustainability of those revenues materially false and misleading. For example, CW-3, CW-5, CW-10, CW-11, and CW-12 explained that there was a

Company-wide push to sell as many APOs as possible in the fourth quarter of 2023 to meet the guidance provided to Wall Street analysts. CW-12 noted that the Company's use of APOs to make up for lagging sales came from the top levels of the Company, including CEO Treace and CFO Hair. CW-3 further noted that TMCI VPs had to be on calls "once a week or once a day, something outlandish, with John Treace" and Berutti "to try to push every rep to sell one of these APO kit bundles." Likewise, CW-5 explained that the APO program was put in place to fulfill promises that the Company had made to Wall Street, and the fourth quarter of 2023 would have been a disaster in the absence of sales from APOs. CW-10 also explained that Company leadership, including Defendant Hair, would either travel the country to meet with the Company's sales managers to discuss how the business was doing, or call those managers into the Company's corporate headquarters in Florida to discuss the same. Finally, CW-7 and CW-10 stated that discounts provided to healthcare providers in connection with an APO sale above a certain percentage had to be approved by the Company's senior leadership.

205. Given this access to information, the Individual Defendants knew or recklessly disregarded, and failed to communicate to the market, that (1) TMCI's "highly focused" product line was not a distinct competitive advantage against "big diversified player[s]"; (2) TMCI was actively losing market share (and would continue to lose market share) to such larger players who were

able to bundle their bunion correction products in service line contracts with IDNs; (3) the reason for TMCI's Q3 2023 earnings miss was not "summer seasonality" but instead the result of increasing competitive pressure from such larger device manufacturers; and (4) the revenue reported in the fourth quarter of 2023 (and thus for the full year of 2023) was not sustainable.

206. Defendants concealed the relevant truth from the market until May 7, 2024 when they revealed that TMCI was revising its guidance in light of "competition from knockoffs" of Lapiplasty which was not coming from just "one competitor per se, but an amalgamation of a number of competitors, big companies, small companies, public and private" that were "now selling products intended to directly compete with Lapiplasty."

207. Defendants concealed the truth from the market, and Lead Plaintiff and other members of the Class suffered losses.

## THE TRUTH EMERGES: LOSS CAUSATION

208. During the Class Period, Lead Plaintiff and the Class purchased TMCI common stock at artificially inflated prices and were damaged thereby. The price of the Company's common stock significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

209. During the Class Period, as detailed above, Defendants made false and misleading statements and omissions that misrepresented (1) the superiority of the Company's most important product, Lapiplasty, (2) the nature and extent of competition on Lapiplasty, including but not limited to the impact of competition from multiline manufacturers, and the fact that competition was something that was already impacting TMCI's business and not a hypothetical future risk; (3) that weakness in demand for Lapiplasty in the summer of 2023 was explained solely by travel schedules and not by competition; (4) the quality and sustainability of the Company's reported revenue in the fourth quarter of 2023 (and thus for the full year of 2023); and (5) that TMCI had effective internal disclosure controls. These misstatements and omissions caused TMCI common stock to trade at artificially inflated levels because they created and/or maintained a misleading perception regarding the sustainability of TMCI's business and growth, which was important to investors' assessments of the investment value of the Company's common stock.

210. The relevant truth regarding Defendants' fraud was revealed via a corrective disclosure and/or materialization of a concealed risk that occurred on May 7, 2024, after market hours.

211. On May 7, 2024, after market hours, TMCI issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for first

quarter of 2024 and its fiscal year 2024 outlook, respectively (the "2024 Guidance Cut"). The press release stated, in relevant part:

> **Financial Outlook**
>
> The Company now expects full-year 2024 revenue of $201 million to $211 million, representing growth of 7% to 13%, compared to full-year 2023. This compares to previous guidance of $220 million to $225 million.

212. During the associated earnings call the same day, Treace revealed that competition – including "more competition from knockoffs of our Lapiplasty products" – was the reason for the guidance cut and that competition (which had previously been brushed aside) was negatively affecting Lapiplasty's growth.

213. As to the knockoffs, Treace stated that TMCI believes "some of these competing products are violating our IP." TMCI's later lawsuits indicate that this reference was, at minimum, to Stryker and Zimmer.

214. Treace continued on to state that TMCI would move "from a company focused solely on Lapidus and related solutions to a comprehensive bunion solutions company." This statement corrected the prior misstatements that TMCI's nearly single product business model was a positive, growth-driving aspect of the Company, and that the presence of larger, more diversified competitors, who could (and did) bundle products, was not a

detriment to TMCI's ability to compete with these larger competitors in the bunion correction market.

215. The revelation that competition, including from "knockoffs," was having a significant impact on TMCI's revenues, and would continue to have an impact going forward – alongside the revelation that TMCI would shift from being a single product company to a "comprehensive bunion solutions company" (i.e., more diversified company) – shocked the market.

216. The shock was foreseeable by Defendants. Competition had been repeatedly, directly, and swiftly rejected as major limitation on Lapiplasty's growth, but now competition was driving a significant guidance cut. For years, and throughout the Class Period, TMCI and Treace had emphasized that Lapiplasty was "so far ahead" of the competition, foreclosing the idea that simple "knockoffs" could reduce Lapiplasty sales significantly. And TMCI and Treace had told the market repeatedly that TMCI's sole focus on Lapiplasty was a competitive advantage, and that diversified competitors were at a *disadvantage* to TMCI because of their wide product suite. Yet, in May 2024, Defendants reversed course and asserted that TMCI would need to become more diversified to compete.

217. TMCI common stock closed at $11.12 per share on May 7, 2024, before the corrective event. On May 8, 2024, TMCI common stock closed at $4.17, a fall of $6.95 per share, a decline of ***62.5%***. This price movement was

accompanied by significantly increased volume, with over 15 million shares trading on May 8, 2024, as opposed to 1 million shares on May 7, and less than 500,000 shares trading in each of the 15 trading days before May 7.

218. No other market, industry, or company-specific news explains the decline in the price of TMCI common stock on May 8, 2024.

219. Further confirming that the decline in the price of TMCI stock was directly related to the 2024 Guidance Cut and the revelation of previously undisclosed successful competition from lower-priced "knockoffs," the price of TMCI common stock declined significantly in after-hours trading on May 7, 2024 (as the corrective information was being issued), and *continued* its decline during the May 8, 2024 trading day.

220. Research analysts' reactions to Defendants' announcement confirms the decline in TMCI's stock price was the result of the 2024 Guidance Cut and revelation of competition impacts.

221. Analysts at Stifel downgraded TMCI in the wake of the revelations from buy to hold and lowered their price target from $11 to $6 per share. Stifel cited competition from imitation Lapiplasty (i.e., "knockoffs") as a reason for the downgrade.

222. Analysts at Truist Securities downgraded TMCI in the wake of the revelations from buy to hold and lowered their price target from $17 to $7 per share. They cited competitive dynamics as a basis for the downgrade. Truist

also observed that the competitive factors involved appeared structural, as opposed to the seasonal issues Defendants had previously blamed for poor results.

223. Analysts at BTIG downgraded TMCI from "Buy" to "Neutral." BTIG analysts noted that management had downplayed the impact of competition and that the revelation that competition from knockoffs was suppressing guidance meant the threat of competition had "gotten very real."

224. Analysts at Morgan Stanley downgraded TMCI and reduced their price target from $15 to $5.50, citing competition.

225. Analysts at J.P. Morgan downgraded TMCI from overweight to neutral and lowered their price target from $15 to $8, citing competitive headwinds.

226. The dramatic price target reductions by analysts indicates market shock at the new information regarding competition and its immediate impact on TMCI's future prospects.

227. Business press likewise connected the share price decline to the 2024 Guidance Cut, and in turn, the revelation of competition from knockoffs. In a May 8, 2024 article, Dow Jones Institutional News Feed reported: "Shares of Treace Medical plummeted to an all-time low after the company cut its 2024 revenue guidance in light of competitive pressures, prompting several analysts to downgrade the stock's rating." The article continued: "The

medical-technology company cut its annual revenue guidance to $201 million to $211 million from a prior outlook for $220 million to $225 million. Chief Executive John Treace attributed the cut in part to increased competition from knockoffs of its Lapiplasty bunion-correction products."

228. In a May 8, 2024, article, Bloomberg First Word reported "Treace Medical shares dropped as much as 61% on Wednesday, its biggest intraday fall on record, after the medical device company cut its full-year revenue guidance, citing 'competitive headwinds.'"

229. John Treace's admissions on May 7, 2024, that the Company was facing competition from knockoffs of Lapiplasty corrected the prior misstatements and omissions detailed above.

230. Defendants' admissions and the 2024 Guidance Cut were also corrective of the Company's statements in the 2023 10-K that "if" TMCI was unable to compete against other manufacturers, its financial condition and operations would be adversely affected. That is, Defendants' admissions and the 2024 Guidance Cut revealed that competition from knockoffs was not hypothetical – indeed, such competition was *already* affecting TMCI's business, and was not a future risk but rather one that had already materialized. The 2024 Guidance Cut was also a materialization of the previously concealed risk of knockoff competition affecting TMCI's growth, as the Company directly tied the guidance cut to knockoff competition.

231. John Treace's admissions and the 2024 Guidance Cut were also corrective of the Company's misstatements regarding the impact of seasonality on the Company's poor results in the third quarter of 2023, as well as misstatements regarding the Company's revenues in the fourth quarter of 2023 (and thus for the full year of 2023). As analysts observed, the competition issues revealed were structural, as opposed to transient or seasonal. These seasonality misstatements omitted that structural competition from knockoffs was also a cause of TMCI's declining growth. The 2024 Guidance Cut, which concerned full year 2024 results, and its direct connection to knockoff competition, informed investors that the growth challenges were not transient or seasonal but rather fundamental and structural.

232. The timing and magnitude of the decline in TMCI stock on May 8, 2024 (and after hours on May 7, 2024, reflected in a close-to-close decline) and public reactions to the news negate any inference that the losses suffered by investors were caused by facts unrelated to Defendants' fraud. As a result of their purchases of TMCI common stock at artificially inflated levels during the Class Period, Lead Plaintiff and the Class suffered economic loss, i.e., damages, under the federal securities laws.

## ADDITIONAL ALLEGATIONS OF SCIENTER

233. As set forth above, Defendants made a series of false and/or misleading statements or omissions, or failed to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading, throughout the Class Period. As alleged herein, in doing so, Defendants acted with scienter because Defendants knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding TMCI, their control over, and/or receipt and/or modification of TMCI's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning TMCI, participated in the violations alleged herein.

234. The statements and omissions at issue here concern TMCI's primary product, Lapiplasty. Specifically, the statements and omissions at issue concern the existence and nature and extent of competition to

Lapiplasty, information that was readily available to persons at the Company given the outsized portion of the Company's revenue and profits directly tied to Lapiplasty. As the Company reported throughout the Class Period, "[s]ales of the Lapiplasty System accounted for substantially all of our revenues in prior years and are expected to continue to account for most of our revenue going forward." The Individual Defendants either were in possession of information regarding the existence and nature and extent of competition to Lapiplasty or were reckless in not knowing or failing to ascertain such facts when they made the statements and omissions complained of herein.

235. The Individual Defendants' knowledge of demand for, and competition with, Lapiplasty can be inferred because these facts were critical to TMCI and its ability to demonstrate sustained growth. Lapiplasty was the core operation of TMCI – a fact which the Individual Defendants repeatedly portrayed as a unique competitive advantage of the Company vis-à-vis larger medical device manufacturers, such as Stryker, that market and sell a variety of products of which bunion correction products represent a miniscule percentage.

236. Many of the statements and omissions at issue here were made in direct response to questions regarding the impact of competition on TMCI and/or Lapiplasty and the competitive dynamics of the market for bunion correction products.

237. Defendants had motive to make misstatements and/or omissions. In particular, TMCI was not a profitable company and thus would need to access the capital markets from time to time to generate sufficient capital to fund operations until the Company could become profitable. In accessing the capital markets in 2021 and again in early 2023, TMCI raised equity financing. The higher TMCI's stock price, the less dilution existing shareholders (including the Individual Defendants, who were each significant shareholders of the Company) would face as a result of these financing activities. Insofar as Defendants could inflate and/or keep the price of TMCI stock inflated, they would reasonably expect that further access to the capital markets would be less costly.

238. Several confidential witnesses have confirmed that Defendants knew, or were reckless in not knowing, that the statements alleged herein to be materially false and/or misleading were, in fact, materially false and/or misleading. Specifically:

239. **CW-1:** According to CW-1, a TMCI Sales Representative beginning in October 2023 and continuing throughout the Class Period who covered a sales territory in South Florida, the fact that competition was negatively impacting demand for Lapiplasty "was a problem that had already kind of existed" upon CW-1's arrival at TMCI in the fourth quarter of 2023. Further, CW-1 learned about Stryker's alleged patent infringement of Lapiplasty on

"day one" of CW-1's tenure at the Company. CW-1 recounted similar, internal discussions of alleged patent infringement against other manufacturers of SSPs, including CrossRoads Extremity Systems and Arthrex, Inc.

240. **CW-2:** According to CW-2, a TMCI Sales Representative beginning in October 2022 and continuing throughout the Class Period who covered a sales territory in Iowa and Illinois, CW-2 began to experience declining demand for Lapiplasty, beginning in the third quarter of 2023, due to significantly cheaper alternatives developed by a number of competitors, including Stryker, CrossRoads Extremity Systems, and Arthrex, Inc. According to CW-2, in the summer of 2023, "it was like somebody turned off a switch," adding that CW-2 went from selling Lapiplasty for about 12 cases per month down to only three or four per month. CW-2 also discussed a corporate culture that was fixated on satisfying Wall Street estimates, adding that on monthly sales conference calls (some of which CEO John Treace personally attended), Aaron Berutti, Senior Vice President, Sales, discussed the fact that Treace was "getting pressure from Wall Street" to "hit these numbers." In addition, CW-2 recounted a conversation with a superior who told CW-2 that the Company was "under so much pressure to hit these numbers that [it] was promising Wall Street."

241. **CW-3:** According to CW-3, a TMCI Sales Representative between 2021 and February 2024 who covered (at varying times) sales territories in

Washington and Texas, Stryker's LapiFuse was competing directly with Lapiplasty, and that the two products were in fact "substantially similar," going as far as to refer to LapiFuse as a "me too" product. CW-3 noted a struggle to convince end users of bunion correction products to adopt Lapiplasty over LapiFuse because those end users were more familiar with Stryker's product lines and the Stryker sales representatives selling them. According to CW-3, the declining demand for Lapiplasty was a "topic of discussion" at local and regional sales meetings, adding that "the writing was on the wall," and "we knew what the market was, how it was trending." CW-3 also described an information sharing hierarchy whereby CW-3 and other sales representatives were in frequent communication with various of their superiors regarding sales trends in a particular geographic area and thus the challenges that the Company's sales representatives were experiencing in the field; these superiors then held weekly (if not more frequent) calls with more senior Company executives, including Aaron Berutti, TMCI's Senior Vice President, Sales, and Treace himself, regarding those sales trends. With respect to the Company's sales of APOs in the fourth quarter of 2023, CW-3 noted that sales representatives were encouraged to "push APOs" to "inflate" numbers for the fourth quarter and "meet a certain metric to round out the year." CW-3 likewise noted that a Regional Vice President of Sales at the Company told him that TMCI VPs had to be on calls "once a week or once a

day, something outlandish, with John Treace" and Berutti "to try to push every rep to sell one of these APO kit bundles." According to CW-3, "There was a lot of pressure from the top" to get sales representatives to persuade clients to buy APOs, and there was "just a lot of pressure to try to hit the national number in Q4" of 2023.

242. **CW-4:** According to CW-4, a TMCI Territory Sales Manager between 2022 and December 2023 who covered a sales territory in Missouri, TMCI was experiencing the impact of competition from "knockoff" products, including LapiFuse, in the second quarter of 2023. Specifically, CW-4 reported seeing poor sales reports for the Midwest region in the middle of 2023, and noted that CW-4's own sales were "down 30-40%" in the second and third quarter of 2023, before rebounding in the fourth quarter. Importantly, CW-4 stated that TMCI was losing business to Stryker "mainly because of contracts" (i.e., service line contracts), and that Stryker would use those contracts to "block out some of [TMCI's] stuff." CW-4 also reported that TMCI had created a "contracting team" that worked to "combat" the effects of the service line contracts utilized by Stryker and other large manufacturers with hospitals and IDNs. According to CW-4, the Company "did invest a lot of money to combat" the service line contracts. With respect to the Company's sales of APOs in the fourth quarter of 2023, CW-4 stated that it became a

"pretty big initiative" within the Company: "It was certainly put out to try to push the APOs."

243. **CW-5:** According to CW-5, a TMCI Sales Representative and District Sales Manager between 2022 and May 2024 who covered a sales territory in Wisconsin, it was "100%" true that TMCI was seeing the impact of competition from "knockoff" products developed by Stryker and CrossRoads Extremity Systems in 2023; in fact, according to CW-5, this was already becoming clear in 2022: "There was already serious, legitimate competition in 2022 – the same as 2023." CW-5 also noted that part of the reason for TMCI's slowing growth was the fact that TMCI had been "locked out of hospitals due to contracts" (i.e., service line contracts). CW-5 explained that it was "immediately" clear that TMCI sales representatives "could not go into any of the hospitals" in CW-5's geographic area because Stryker was a "preferred vendor" of that region's dominant healthcare system, whose contracts with Stryker and other "major suppliers" stipulated that the hospital system had to spend 85% of total spend with those suppliers, leaving TMCI to compete for the remaining 15%. Importantly, in late 2023 or early 2024 at a Company meeting in Atlanta which Senior Vice President, Sales, Aaron Berutti attended, CW-5 personally delivered a presentation on TMCI's struggle to compete with these major suppliers and their service line contracts. CW-5 also recounted discussions with a surgeon from Wisconsin who stated that he

believed that Lapiplasty's efficacy did not justify its price tag; according to the surgeon, "I'm not going to spend 8 grand for an idea I can go replicate myself." With respect to the Company's sales of APOs in the fourth quarter of 2023, CW-5 explained that the program was put in place to fulfill promises that the Company had made to Wall Street, and the fourth quarter of 2023 would have been a disaster in the absence of sales from APOs. Moreover, according to CW-5, TMCI's use of APOs in December 2023 allowed the Company to strategically delay shipment of Lapiplasty kits that had been purchased through APO sales to determine if it would be more beneficial for the Company to book the revenue in the fourth quarter of 2023 or the first quarter of 2024; specifically, CW-5 stated that TMCI told certain hospitals that it would not ship the product "until the last week of December," which gave the Company the ability to "wait and see" if it needed the sale to count for the fourth quarter of 2023 or the first quarter of 2024. This allowed TMCI to "pad" its books and "ship it when it was best for" TMCI.

244. **CW-6:** According to CW-6, a Sales Representative and Territory Manager for TMCI between June 2023 and December 2023 who covered a sales territory in Alaska, TMCI began to feel the impact of competition from "knockoff" products, including LapiFuse, in 2023. According to CW-6, larger competitors like Stryker were outcompeting TMCI due to their ability to "do a higher volume and lower pricing." CW-6 recounted conversations with

physicians who "just didn't see" how Lapiplasty "was better at all" than LapiFuse.

245. **<u>CW-7:</u>** According to CW-7, a District Sales Manager and Regional Vice President of Sales for TMCI between July 2022 and August 2024, while TMCI had sold Lapiplasty kits through APOs in the past, the pressure was "ramped up" in the fourth quarter of 2023 in order to "catapult" the Company as it was "running behind on hitting numbers." CW-7 described the Company's APO push as "rob[bing] from the future to pay the present," and noted that TMCI's non-executive employees "deduced" that the 2024 Guidance Cut was the result of having aggressively pushed APOs in the fourth quarter of 2023: for "customer-facing" employees, "it was kind of easy to figure out." CW-7 also stated that, when confronted with the possibility that fourth quarter APOs would result in lower sales in future quarters, the Company's Senior Vice President of Sales, Aaron Berutti, responded by instructing a Regional Vice President of Sales to "find more accounts" "to do more APOs." CW-7 further stated that while a Lapiplasty kit sold through an APO was generally subject to a 5-10% discount, discounts of a greater percentage were employed and that such larger discounts required approval from Berutti. With respect to the percentage of the Company's revenue derived from sales of APOs in the fourth quarter of 2023, CW-7 stated that he would estimate that number to be "at least 20% of the overall sales."

246. **CW-8:** According to CW-8, a Sales Representative for TMCI between June 2023 and November 2024 who covered a sales territory in Indiana, the Company's push to sell APOs was an attempt by Berutti to "cover his ass" and boost sales by the end of the year and "deal with the repercussions later." CW-8 recounted a "significant amount of pressure" to sell APOs, and that the push to do so in late 2023 made it very difficult for the Company to generate additional sales in subsequent quarters. In CW-8's view: "I think the overinflated number off of the end of [2023] because of the APO purchases definitely played into in effect why they had to reduce their earnings to Wall Street" – "[I]f anybody had a brain, you could figure that out pretty quick." According to CW-8 the percentage of TMCI's revenue in the fourth quarter of 2023 attributable to sales of APOs was likely greater than five percent, but it "could be greater than that."

247. **CW-9:** According to CW-9, a Specialty Medical Device Representative for TMCI between June 2023 and June 2024 who covered a sales territory in Long Island, New York, sales of APOs "would benefit in the short term," but the practice "had the propensity to screw you in the long term."

248. **CW-10:** According to CW-10, a District Sales Manager for TMCI between June 2023 and June 2024 who worked in the Jacksonville, Florida area, in the fourth quarter of 2023 and the first quarter of 2024, "[t]here was

a push" for sales representatives to sell APOs and thereby "close the gap" between sales forecasts and "what they were saying to Wall Street." CW-10 added that discounts of greater than 20% in connection with an APO had to be approved by an "executive team" that included Berutti. With respect to the 2024 Guidance Cut, CW-10 stated that the aggressive use of APOs "certainly did contribute" to it because, by using APOs, "[y]ou are borrowing from the future for today, and then you have to find another way to grow the business." CW-10 estimated that between five and twenty percent of TMCI's revenue in the fourth quarter of 2023 came from the sale of APOs. CW-10 also added that while sometimes Company leadership, such as Defendant Hair, would travel to meet with sales managers in various regions, the company's sales managers would be "called into corporate" from time to time to meet in-person with the Individual Defendants "to show [their] business, how [they] were doing."

249. **CW-11:** CW-11, an Area Sales Manager for TMCI between June 2021 and October 2024 who covered a sales territory in northern Ohio, described the APO program as a likely "attempt to try to boost sales," which "almost always" came near the end of the quarter. CW-11 noted a belief that because "[a]ll you're doing is borrowing money," it was "more difficult to gain revenue" in quarters after a sales representative had sold APOs.

250. **CW-12:** CW-12, a Vice President, National Accounts for TMCI between January 2022 and August 2024 who worked from California, explained that the APO initiative was the result of additional pressure the Company was facing to hit the revenue targets it had given to Wall Street: "A lot of this was driven by, 'We're coming up to the end of the quarter and trends show there will be a gap. We're going to run an APO. Sales managers, get your teams ready,'" CW-12 explained. CW-12 stated that the Company's use of APOs to make up for lagging sales came from the top levels of the Company, including CEO Treace and CFO Hair. CW-12 estimated that the amount of TMCI's fourth quarter 2023 revenue derived from the sale of APOs was "definitely significant" and that it was "definitely" reasonable to believe that the actual amount of revenue attributable to APOs was between twenty-five and forty percent.

251. As set forth above, the troubles facing the Company were well known by TMCI employees from all across the United States – territories that included Florida, Iowa, Illinois, Washington, Texas, Missouri, Wisconsin, Alaska, Indiana, New York, Ohio, and California. These employees recounted the impact that competition from companies like Stryker was having on TMCI's ability to successfully market and sell Lapiplasty, and how TMCI's senior leadership aggressively employed APOs to close the gap following the Company's poor earnings in the third quarter of 2023. Given the information

sharing hierarchy described by CW-3, CW-10, and others, coupled with the facts that (1) Lapiplasty was the core operation of TMCI and (2) TMCI has admitted having "extensive" knowledge of Stryker and its competitive practices, the Individual Defendants knew, or were at the very least reckless in not knowing, that TMCI was not "way out ahead" of the competition, and that its narrowly focused model was not a competitive advantage.

## CLASS ACTION ALLEGATIONS

252. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired Treace Medical common stock between May 8, 2023 and May 7, 2024, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company, and members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

253. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Treace Medical's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of Treace

Medical common stock were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by Treace Medical or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

254. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

255. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

256. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the

business, operations, and prospects of Treace Medical; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

257. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

258. The market for Treace Medical's common stock was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Treace Medical's common stock traded at artificially inflated prices during the Class Period. On May 22, 2023, the Company's share price closed at a Class Period-high of $26.90 per share. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock relying upon

the integrity of the market price of Treace Medical's common stock and market information relating to Treace Medical, and have been damaged thereby.

259. During the Class Period, the artificial inflation of Treace Medical's share price was caused by the material misrepresentations and/or omissions particularized in this Third Amended Complaint causing the damages sustained by Lead Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Treace Medical's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Treace Medical and its business, operations, and prospects, thus causing the price of the Company's common stock to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's common stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Lead Plaintiff and other members of the Class purchasing the Company's common stock at such artificially inflated prices, and each of them has been damaged as a result.

260. At all relevant times, the market for Treace Medical's common stock was an efficient market for the following reasons, among others:

(a) Treace Medical shares met the requirements for listing, and were listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) As a regulated issuer, Treace Medical filed periodic public reports with the SEC and/or the NASDAQ;

(c) Treace Medical regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) Treace Medical was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

261. As a result of the foregoing, the market for Treace Medical's common stock promptly digested current information regarding Treace

Medical from all publicly available sources and reflected such information in Treace Medical's share price. Under these circumstances, all purchasers of Treace Medical's common stock during the Class Period suffered similar injury through their purchase of Treace Medical's common stock at artificially inflated prices, and a presumption of reliance applies.

## FIRST CLAIM

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against All Defendants

262. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

263. This Count is asserted against each Defendant and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC. All Defendants are sued as primary participants in the wrongful and illegal conduct charged in this Count.

264. Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) through a series of materially false and misleading public statements made during the Class Period, which were made individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails and wires: (1) on the Company's Q1 2023 Earnings Call; (2) at the BAML Conference; (3) at the UBS Summit; (4) on the Company's Q3 2023 Earnings Call and in the accompanying investor

presentation; (5) at the Stifel Healthcare Conference; (6) at the J.P. Morgan Healthcare Conference and in the accompanying investor presentation; (7) the January 2024 8-K; (8) the February 2024 8-K; (9) the 2023 10-K; and (10) on the Company's Q4 2023 Earnings Call.

265. Specifically, Defendant Treace made materially false or misleading statements, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in Paragraphs 160, 163, 166, 168, 169, 173, 178, 183, 185, 189, 199, and 200.

266. Specifically, Defendant Hair made materially false or misleading statements, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in Paragraphs 181 and 200.

267. Specifically, Defendant TMCI made materially false or misleading statements, and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged in Paragraphs 171, 179, 188, 190, 191, 193, and 198.

268. Additionally, as the CEO of Defendant TMCI, the materially false or misleading statements made by Defendant Treace outlined above in

Paragraphs 160, 163, 166, 168, 169, 173, 178, 183, 185, 189, 199, and 200 are attributable to Defendant TMCI.

269. Additionally, as the CFO of Defendant TMCI, the materially false or misleading statements made by Defendant Hair outlined above in Paragraphs 181 and 200 are attributable to Defendant TMCI.

270. In making the statements outlined above, Defendants engaged and participated in a course of conduct to conceal adverse material information about Treace Medical's financial well-being and prospects, as specified herein.

271. Each of the Individual Defendants' primary liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at Defendant TMCI during the Class Period and members of the Company's management team or had control thereof; (ii) each of these Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these Individual Defendants enjoyed significant personal contact and familiarity with one another and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these Individual Defendants was aware of the Company's dissemination of

information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

272. The Individual Defendants, who are and, throughout the Class Period, were senior executive officers of Defendant TMCI, had actual knowledge of the material omissions and/or the falsity or misleading nature of the statements set forth above, and intended to deceive Lead Plaintiff and other members of the Class. For example, the Individual Defendants had access to the Company's sales reports and surgeon utilization rates, as well as access to members of the Company's sales force.

273. In the alternative, during the Class Period, Defendants acted with severe recklessness and disregard for the truth in not knowing that the public documents and statements issued or disseminated in the name of Treace Medical were materially false or misleading in that they failed to ascertain and to disclose adverse facts to Lead Plaintiff and other members of the Class, even though such facts were readily available to them.

274. The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt or making of the materially false and misleading statements, and/or their associations within the Company that made them privy to non-public information concerning the Company, participated in the fraudulent conduct alleged herein.

275. Defendants' purpose in making the material misrepresentations and/or omissions specified above was to conceal the true facts concerning the financial condition and prospects of Defendant TMCI from the investing public and support the artificially inflated price of the Company's common stock. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

276. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Treace Medical's common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the Company's common stock traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Lead Plaintiff

and other members of the Class acquired Treace Medical common stock during the Class Period at artificially high prices and were damaged thereby.

277. At the time of said misrepresentations and/or omissions, Lead Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and other members of the Class and the marketplace known the truth regarding the problems that Treace Medical was experiencing, which were not disclosed by Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their Treace Medical common stock, or, if they had acquired such common stock during the Class Period, would not have done so at the artificially inflated prices which they paid

278. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period in an amount to be established at trial.

279. By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder and are liable to Lead Plaintiff and other members of the Class for substantial damages which they suffered in connection with their purchases of Treace Medical common stock during the Class Period.

## SECOND CLAIM

**Violations of Section 20(a) of the Exchange Act Relating to Primary Violations of Section 10(b) and Rule 10b-5(b) Promulgated Thereunder Against Defendant John T. Treace**

280. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

281. This Count is asserted against Defendant John T. Treace under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Defendant Treace is sued as a control person of Defendant TMCI, a primary violator of the Exchange Act, as explained immediately below.

282. As set forth above in Paragraphs 171, 179, 188, 190, 191, 193, and 198, Defendant TMCI made materially false and misleading statements during the Class Period.

283. During the Class Period, Defendant Treace acted as a controlling person of Defendant TMCI within the meaning of Section 20(a) of the Exchange Act as alleged herein.

284. As the CEO of Defendant TMCI, Defendant Treace had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the violations of Rule 10b-5(b) as alleged herein, and exercised the same. For example, Defendant Treace signed and authorized the

publication of a Company SEC filing that Lead Plaintiff alleges contained materially false and/or misleading statements, specifically, the 2023 10-K.

285. During the Class Period, Defendant Treace participated in the operation and management of Defendant TMCI, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs.

286. By virtue of his high-level position as the CEO of Defendant TMCI, his ownership and contractual rights in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements issued by the Company in its filings with the SEC and otherwise disseminated to the investing public, Defendant Treace had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Defendant TMCI, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading. Defendant Treace was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

287. For example, during the Company's earnings call on May 8, 2023, Defendant Treace told investors that the Company was not "really seeing any

incremental . . . opposition to [the Company's] momentum coming from these [competitors' devices.]" This indicates that Defendant Treace had knowledge of the Company's sales and incremental market share compared to competitors.

288. Because of his senior executive position as the CEO of Defendant TMCI, Defendant Treace knew or recklessly disregarded adverse, non-public information about the Company's financial condition and prospects.

289. In addition, CW-3 has confirmed that there existed at TMCI an information sharing hierarchy whereby CW-3 and other sales representatives were in frequent communication with various of their superiors regarding sales trends in a particular geographic area and thus the challenges that the Company's sales representatives were experiencing in the field; these superiors then held weekly (if not more frequent) calls with more senior Company executives, including Aaron Berutti, TMCI's Senior Vice President, Sales, and Defendant Treace himself, regarding those sales trends. As CW-10 stated, Company leadership frequently traveled to meet with sales managers in various regions "to show [their] business, how [they] were doing," and that sometimes, sales managers were instructed to meet Company leadership at its headquarters in Florida to discuss the same. Moreover, with respect to the Company's use of APOs to make up for lagging sales in the

fourth quarter of 2023, CW-12 stated that this initiative came from the top levels of the Company, including from Defendant Treace.

290. Defendant TMCI violated Section 10(b) and Rule 10b-5(b) by making materially false and misleading statements as set forth above in Paragraphs 171, 179, 188, 190, 191, 193, and 198. By virtue of his position as a controlling person of Defendant TMCI, Defendant Treace is liable pursuant to Section 20(a) of the Exchange Act.

291. As a direct and proximate result of the wrongful conduct alleged herein, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

292. By reason of the foregoing, Defendant Treace violated Section 20(a) of the Exchange Act and is liable to Lead Plaintiff and other members of the Class for substantial damages which they suffered in connection with their purchases of Treace Medical common stock during the Class Period.

## THIRD CLAIM

### Violations of Section 20(a) of the Exchange Act Relating to Primary Violations of Section 10(b) and Rule 10b-5(b) Promulgated Thereunder Against Defendant Mark L. Hair

293. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

294. This Count is asserted against Defendant Mark L. Hair under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). Defendant Hair is sued as a control person of Defendant TMCI, a primary violator of the Exchange Act, as explained immediately below.

295. As set forth above in Paragraphs 171, 179, 188, 190, 191, 193, and 198, Defendant TMCI made materially false and misleading statements during the Class Period in the Company's filings with the SEC and in presentations provided to investors.

296. During the Class Period, Defendant Hair acted as a controlling person of Defendant TMCI within the meaning of Section 20(a) of the Exchange Act as alleged herein.

297. As the CFO of Defendant TMCI, Defendant Hair had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the violations of Rule 10b-5(b) as alleged herein, and exercised the same. For example, Defendant Hair signed and authorized the publication of certain of the Company's SEC filings that Lead Plaintiff alleges contained materially false and/or misleading statements, specifically, the January 2024 8-K, the February 2024 8-K, and the 2023 10-K.

298. During the Class Period, Defendant Hair participated in the operation and management of Defendant TMCI, and conducted and

participated, directly and indirectly, in the conduct of the Company's business affairs.

299. By virtue of his high-level position as the CFO of Defendant TMCI, his ownership and contractual rights in the Company, participation in, and/or awareness of the Company's operations and intimate knowledge of the false statements issued by the Company in its filings with the SEC and otherwise disseminated to the investing public, Defendant Hair had the power to influence and control, and did influence and control, directly or indirectly, the decision making of Defendant TMCI, including the content and dissemination of the various statements which Lead Plaintiff contends were false and misleading. Defendant Hair was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

300. For example, during the Company's earnings call on February 27, 2024, Defendant Hair told investors that the Company "continue[s] to add a lot of surgeons and [the Company] know[s] that those who have been around longer just do more and so [the Company] expect[s] utilization to continue to increase, notwithstanding the fact that [the Company] will continue to add a lot more surgeons in 2024 and beyond." This indicates that Defendant Hair

had knowledge of the Company's surgeon acquisition rate and the surgeons' utilization rates, which directly impact demand for Lapiplasty.

301. Because of his senior executive position as the CFO of Defendant TMCI, Defendant Hair knew or recklessly disregarded adverse, non-public information about the Company's financial condition and prospects.

302. In addition, CW-3 has confirmed that there existed at TMCI an information sharing hierarchy whereby CW-3 and other sales representatives were in frequent communication with various of their superiors regarding sales trends in a particular geographic area and thus the challenges that the Company's sales representatives were experiencing in the field; these superiors then held weekly (if not more frequent) calls with more senior Company executives, including Aaron Berutti, TMCI's Senior Vice President, Sales, regarding those sales trends. As CW-10 stated, Company leadership, including Defendant Hair, frequently traveled to meet with sales managers in various regions "to show [their] business, how [they] were doing," and that sometimes, sales managers were instructed to meet Company leadership at its headquarters in Florida to discuss the same. Moreover, with respect to the Company's use of APOs to make up for lagging sales in the fourth quarter of 2023, CW-12 stated that this initiative came from the top levels of the Company, including from Defendant Hair.

303. Defendant TMCI violated Section 10(b) and Rule 10b-5(b) by making materially false and misleading statements as set forth above in Paragraphs 171, 179, 188, 190, 191, 193, and 198. By virtue of his position as a controlling person of Defendant TMCI, Defendant Hair is liable pursuant to Section 20(a) of the Exchange Act.

304. As a direct and proximate result of the wrongful conduct alleged herein, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

305. By reason of the foregoing, Defendant Hair violated Section 20(a) of the Exchange Act and is liable to Lead Plaintiff and other members of the Class for substantial damages which they suffered in connection with their purchases of Treace Medical common stock during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on behalf of itself and the Class of persons similarly situated, prays for relief and judgment as follows:

306. Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

307. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all

damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

308. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

309. Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a jury trial.

Dated: July 29, 2026

Respectfully submitted,

By: /s/ *Lawrence M. Rolnick*
Lawrence M. Rolnick (pro hac vice)
Marc B. Kramer (pro hac vice)
Richard A. Bodnar (pro hac vice)
**ROLNICK KRAMER**
**SECURITIES LITIGATION LLP**
PENN 1, Suite 3401
1 Pennsylvania Plaza
New York, NY 10119
Tel: (212) 597-2800
Fax: (212) 597-2801
Email: lrolnick@rksllp.com
mkramer@rksllp.com
rbodnar@rksllp.com

*Lead Counsel for the Class and Lead Plaintiff Special Situations Private Equity Fund, L.P.*

Robert F. Elgidely, Esq.
Florida Bar No. 111856
**FOX ROTHSCHILD LLP**
One Biscayne Tower
2 South Biscayne Blvd., Suite 2750
Miami, FL 33131
Tel: (305) 443-6543
Fax: (305) 442-6541
Email: relgidely@foxrothschild.com

*Local Counsel for the Class and Lead Plaintiff Special Situations Private Equity Fund, L.P.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on July 29, 2026, I electronically filed the foregoing Third Amended Class Action Complaint and Demand for Jury Trial with the Clerk of the Court using the CM/ECF system. The electronic case filing system sent a "Notice of Electronic Filing" to the attorneys of record who have consented in writing to accept this notice as service of this document by electronic means.

By: /s/ *Lawrence M. Rolnick*
Lawrence M. Rolnick, Esq.